Robert G. BARSTOW, Appellant,

v.

The STATE of Texas and County of Travis, Appellees.

No. 3–86–016–CV.

Court of Appeals of Texas, Austin.

Dec. 2, 1987.

Rehearing Denied Jan. 13, 1988.

**498**

Thomas B. Hudson, Jr., Graves, Dougherty, Hearon & Moody, Austin, for appellant.

James B. Ewbank, Davis, Cantilo, Welch & Ewbank, Austin, for appellees.

Before POWERS, BRADY and ABOUSSIE, JJ.

POWERS, Justice.

Robert G. Barstow appeals from a district-court judgment, rendered after a jury trial, that decrees the following relief in favor of appellees, the State of Texas and Travis County: (1) the establishment of a road easement in favor of the public across two lots owned by Barstow; and (2) a partition of one of the lots in which Barstow and the County held undivided fractional interests. We will affirm that part of the judgment partitioning one of the lots; we will reverse that part establishing a road easement, rendering judgment that appellees take nothing in that regard.

### THE CONTROVERSIES

The lawsuit pertains to two adjoining lots in the Comanche Point Subdivision on the Lake Travis Reservoir in Travis County. One of the lots is known as Lot 24A, the other as Fisher Reserve No. 2. The latter lot shares a common boundary with another lot owned by the Lower Colorado River Authority ("LCRA"). The three lots, together with another privately owned lot, comprise "Windy Point" on Lake Travis.

The LCRA lot is a place of public resort and recreation on the lake. The public has access to the lot via an adjoining county road, as indicated on the attached drawing. The drawing also shows that the LCRA lot is largely divided into two parts by the waters of the lake, even when the waters are at the 670-foot level. When the waters rise above that level, the public use an elevated causeway erected by the County to connect the western and eastern parts of the LCRA lot. Occasionally, however, the waters rise sufficiently to inundate even the causeway itself. The public has been accustomed to traversing a way across Lot 24A and Fisher Reserve No. 2, as indicated on the drawing, whether the causeway is submerged or not. This pathway is between one-half and six-tenths of a mile in length.

Barstow holds record title to Lot 24A; he and the County hold record title as tenants in common in Fisher Reserve No. 2. Both lots were previously owned by one Bob Wentz, who acquired them in 1948. Title descended to Wentz' heirs when he died in 1957. In 1963, the Wentz heirs conveyed Lot 24A to Colonel and Mrs. John Kummer, who, in turn, conveyed the lot to Barstow in 1976. In 1981, some of the Wentz heirs conveyed to Barstow an undivided fractional interest in Fisher Reserve No. 2. Thereafter, in 1983 and 1984, the Wentz heirs conveyed to Travis County all their remaining interest in Fisher Reserve No. 2. Thus, the county became a tenant in common with Barstow.

In the cause on appeal, appellees sued Barstow to establish a public easement coextensive with the way used by the public across Lot 24A and Fisher Reserve No. 2. They contended for that easement on two theories alleged in their trial petition: (1) an easement by prescription and (2) an

implied dedication of the way to the public. The County also sued for a partition of Fisher Reserve No. 2 according to the fractional undivided interests held by the County and Barstow in that lot. Following the jury's return of a verdict on special issues, the trial court rendered judgment establishing the public easement (but without specifying upon which of the two alleged theories the judgment rested) and ordering partition of Fisher Reserve No. 2 on the basis of Barstow owning a 45% fractional interest and the County a 55% fractional interest. On appeal, Barstow attacks both aspects of the trial-court judgment.

## EASEMENT BY PRESCRIPTION

■ It is well-settled that the public may, through use of a roadway under a claim of right hostile and adverse to the owner's claim, acquire by prescription a public easement across the owner's land. The requisite period of use is ten years by analogy to Tex.Civ.Prac. & Rem.Code Ann. §§ 16.021, 16.026 (1986) and predecessor statutes.[1] *See Haas v. Choussard,* 17 Tex. 588, 591 (1856); *Wiegand v. Riojas,* 547 S.W.2d 287, 289 (Tex.Civ.App.1977, no writ); Childress, *Does Public User Give Rise to a Prescriptive Easement or Is It Merely Evidence of Dedication?,* 6 Tex.L. Rev. 365 (1928).

The jury found in answer to special issues that the public had used the roadway under a claim of right, adverse and hostile to Barstow's claim, for a period of ten continuous years. The judgment may possibly rest on those findings. If so, Barstow contends the judgment is erroneous for the reasons next to be discussed.

*Applicability of the Soldiers' and Sailors' Civil Relief Act.* Barstow contends the judgment is erroneous for failing to give effect to the Soldiers and Sailors Civil Relief Act, 50 U.S.C.App. § 525 (1981)

(hereinafter "SSCRA"). The SSCRA was enacted in 1940 for the direct and indirect benefit of those on active service in the military and naval forces of the United States, as was the case under an antecedent statute. Section 525 provides:

> The period of military service shall not be included in computing any period ... for the bringing of any action ... in any court ... by ... any person in military service or by ... his heirs, executors, administrators, or assigns, whether such cause of action ... shall have accrued prior to or during the period of such service....

If applicable to the case, § 525 requires that Colonel Kummer's period of active service be deducted in computing the ten-year limitation period necessary for appellees to acquire title by prescription. Tex.Civ.Prac. & Rem.Code § 16.021, *supra; Easterling v. Murphey,* 11 S.W.2d 329 (Tex.Civ.App. 1928, writ ref'd n.r.e.); *Scruggs v. Troncalli,* 307 S.W.2d 300 (Tex.Civ.App.1957, writ ref'd n.r.e.).

Barstow reasons that § 525 *is* applicable to the case because the undisputed evidence shows that in 1976 he received conveyance of Lot 24A from Colonel Kummer; that Colonel Kummer was on active service in the United States Air Force when he acquired the lot in April 1963; and, that he remained on active service until his retirement in April 1973. Appellees rejoin that § 525 is not applicable because the protection given therein is personal to the servicemember.

■ The intent in § 525 is plain and express that the period of military service shall not be included even when the action is brought by the "assigns" of one in military service. It is equally plain that § 525 was meant to apply to actions for real property as well as intangible claims. We therefore construe the word "assigns" to

1. The jury answered "we do" in response to special issues one and two (a) which inquired as follows:

**SPECIAL ISSUE NO. 1:**
Do you find from a preponderance of the evidence that there has been adverse use of the road in question by the public?

[Instructions defining "adverse use" and "claim of right" are omitted here, but are set forth in the text of the opinion]

**SPECIAL ISSUE NO. 2a:**
Do you find from a preponderance of the evidence that such adverse use of the road in question by the public, if any, was continuous for a period of at least 10 years?

include those, such as Barstow, who take real property by grant from the servicemember. *See Harlowe v. Hudgins,* 84 Tex. 107, 19 S.W. 364, 365 (1892); *Neeley v. Intercity Management Corp.,* 623 S.W.2d 942, 951 (Tex.App.1981, no writ). We hold then that the provisions of § 525 are not barred from application here merely because Colonel Kummer did not personally bring his cause of action for recovery of possession.

■ Appellees next oppose any application of § 525 in the present case because, they contend, that statute does not extend the limitations period in favor of a "career serviceman," even though he is literally a "person in military service" to whom the statute nominally applies. *Pannell v. Continental Can Co.,* 554 F.2d 216, 255 (5th Cir.1977). We disagree with this construction of § 525. Such an exception is not contained in the text of § 525 nor is it dictated by any other provision of the SSCRA we have found. If such an exception exists, it must be by reason of judicial construction.

In the *Pannell* decision, the period of the servicemember's active service was included in the limitations period because the evidence did not show that he was "handicapped by his military service from asserting any claim he had prior to the expiration of the prescribed period"; and, in consequence, "the prescriptive period was not tolled as to him." 554 F.2d at 225. The only relevant judicial decisions cited in *Pannell* deal with statutory periods allowed for the redemption of property sold to enforce the owner's liability for property taxes—the same circumstances present in *Pannell.*

We note, in that regard, that other sections of the SSCRA *do* provide that military service must materially prejudice the servicemember before the SSCRA protections may apply. For example, § 590 of the SSCRA permits a court to give relief from the enforced collection of taxes "unless in its opinion the ability of the applicant to comply with the terms of such obligation or liability or to pay such tax or assessment has not been materially affect-

ed by reason of his military service," as determined after notice and hearing; the burden of proof being implicitly placed on the opposing party. This is *not* the tenor and effect of § 525, the text of which is distinctly different: "The period of military service *shall not* be included ..." (emphasis added). Section 590 does demonstrate, however, that Congress could have expressly included a similar provision had it acted with that intention in promulgating § 525.

We believe, in addition, that the "career serviceman" exception created in *Pannell,* with respect to § 525, cannot be judicially administered in the naked way suggested in that opinion. The term "career serviceman" implies no definite or agreed standard commensurate with its importance if it is to be a legal determinant of whether a servicemember shall be excluded from the protection of § 525. The term "career serviceman" is obviously not a fact, but rather a conclusion drawn from facts considered in light of some applicable legal criteria. But what shall constitute the criteria for a "career" soldier, sailor, or airman for the purposes of applying § 525? What issues of fact and law determine that an individual is a "career serviceman" and *when he acquired that status?* The answers to these questions are not suggested in *Pannell,* they are not suggested by appellees, nor are they self-evident. Similar objections may be made to the *Pannell* requirement that the "career serviceman" show himself "handicapped by his military service from asserting any claim," in a timely fashion, before he may come within the protection given by § 525.

■ We believe the text of § 525 demonstrates that Congress wished to avoid such complexities in favor of the simpler rule stated explicitly in the text of the statute. Other circuits differ from *Pannell* in its construction of § 525, and the Supreme Court of the United States has not determined the point. *See, e.g., Bickford v. U.S.,* 656 F.2d 636, 641 n. 9, 228 Ct.Cl. 321 (1981). We are not bound to follow *Pannell* merely because Texas lies within the geographical limits of the Fifth

Circuit.[2] *Pannell* is as persuasive as its logic. We decline therefore to follow it, even if we were able to assign some definite meaning to the term "career serviceman" and imagine some way to apply it objectively and consistently. In any case, we need not apply *Pannell* because it was not established as a matter of law or fact that Colonel Kummer *was* a "career serviceman," within whatever meaning the *Pannell* court intended by that expression.

Therefore, we hold that the period of Colonel Kummer's active service must be deducted from any period of hostile and adverse possession found by the jury. We shall evaluate accordingly Barstow's complaints against the legal and factual sufficiency of the evidence to support that finding.

By an orchestration of the jury's answers to various special issues, Barstow argues that the jury "found" that the period of adverse and hostile possession included the period April 1963 to April 1973—the period of Colonel Kummer's active service. This patently is not the case. The jury answers to which Barstow refers are, in each instance, "We do not." This indicates the jury's *failure to find* the propositions submitted to them. It "finds" or establishes nothing. The jury's verdict does not, however, contradict the undisputed evidence that Colonel Kummer was on active service during the period stated and that he conveyed one of the lots to Barstow in 1976. It remains then for us to give § 525 whatever effect it may have under those undisputed facts.

■ *Sufficiency of the Evidence.* To sustain their prescriptive claim under a theory of "adverse" possession, appellees were bound to adduce more than a scintilla of evidence that the public's possession was *under a claim of right adverse and hostile to that of the record owner.* Without

---

2. The doctrine of *stare decisis* requires that all courts adhere, as a general rule, to the principles and rules laid down on a question of law by any court *to which obedience is owed in the matter.* Consequently, the doctrine binds all Texas state courts to the decisions of the Supreme Court of Texas on a particular question of law arising in a civil case and to the decisions of the Texas Court of Criminal Appeals in "criminal law matters." Tex. Const. Ann. art. 5, §§ 3, 5 (Supp.1987); Tex.Gov't Code Ann. § 22.001 (Pamp.Supp.1987). But the various Courts of Appeals are free to differ among themselves on a question of law that remains undecided by the two courts to which they owe obedience. "Obedience, rather than rank, is the key." Moore & Oglebay, "The Supreme Court, Stare Decisis and Law of the Case," 21 Tex.L.Rev. 514, 524 (1943).

On questions of federal law—such as the proper interpretation of a federal statute—all courts in every state owe obedience to the Supreme Court of the United States. Their duty to obey results from an orchestration of two factors: (1) the legal principle that a court's construction of a statute becomes an integral part of the statute itself; and, (2) the supremacy clause of Article VI of the Constitution of the United States, making the laws of the United States, enacted pursuant to the Constitution, "the supreme law of the land" binding on "the Judges in every State." And when no decision by the Supreme Court appears to be directly in point, Texas courts look to *analogous* decisions *by that Court* in arriving at the meaning proper to be assigned the federal statute, *Paddock v. Siemoneit,* 147 Tex. 571, 218 S.W.2d 428, 434 (1949), notwithstanding that United States Courts of Appeals may have decided the question, *see, e.g., Southwestern Greyhound Lines, Inc. v. Railroad Commission of Texas,* 128 Tex. 560, 99 S.W.2d 263, 268 (1936).

What then of the decisions of the United States Courts of Appeals, such as the *Pannell* decision in the present case? Save for matters not material here, in creating the various United States Courts of Appeals, Congress limited their jurisdiction to appeals taken from the final decisions of *federal district courts.* 28 U.S.C.A. § 1291 (Supp.1987). Consequently, the decisions of one federal Court of Appeals on a question of law do not bind any other federal Court of Appeals under the doctrine of *stare decisis.* Nor do they bind *any* Texas court, *even on federal questions,* although they are of course received with respectful consideration:

While a decision of a federal court, other than the Supreme Court, may be persuasive in a state court on a federal matter, it is, nevertheless, not binding, *since the state court owes obedience to only one federal court, namely, the Supreme Court.* The converse is also true: a decision of a state court on a federal matter may be persuasive in the federal courts but it is not binding.

Moore & Oglebay, *supra,* at 525 (emphasis added); *see also, Woodard v. Texas Dept. of Human Resources,* 573 S.W.2d 596, 598 (Tex.Civ.App. 1978, writ ref'd n.r.e.); Annot., 147 A.L.R. 857 (1943); 21 C.J.S. *Courts* § 206, at 377–78 (1940 & Supp.1987). The review powers of the Supreme Court of the United States permit a proper remedy when, in its opinion, a uniformity of decision is required concerning any federal question. *Moore v. Ogleby, supra,* at 524.

evidence of that vital fact, evidence of long-continued public use, standing alone, was insufficient to support the claim. *Brooks v. Jones,* 578 S.W.2d 669 (Tex.1979); *Othen v. Rosier,* 226 S.W.2d 622 (Tex.1950); *Osborn v. Deep Rock Oil Corp.,* 153 Tex. 281, 267 S.W.2d 781 (1954); *Gill v. Pringle,* 224 S.W.2d 525 (Tex.Civ.App.1949, writ ref'd).

Accordingly, the jury were instructed that the term "adverse use" meant:

> the open and hostile use of the road by the public under such circumstances as were reasonably calculated to put the landowner on notice that the public was using the land under a claim of right inconsistent with the use made and enjoyed by the owner of said land for the period of time in question, and that such use was not by express or implied license or permission.

The jury were further instructed that the term "claim of right" meant:

> a use of the road in question by the public under circumstances reasonably manifesting that the public is using the road on its own initiative as if it owned said road and without seeking permission or consent from anyone....

We believe the instructions erroneous in some respects, *see e.g., Ellis v. Jansing,* 620 S.W.2d 569 (Tex.1981), but we need not digress in that regard.

■ There is no contention that the record owner was given *express* notice of the public's adverse claim. Consequently, the issue reduces to whether the evidence showed *constructive* notice by the character of the public's use of the roadway—a use "reasonably calculated to put the landowner on notice that the public was using the land under a claim of right ..."

The evidentiary record contains the testimony of ten members of the general public who made personal use of the roadway and other roads in and about Windy Point. The disputed road was described as "unimproved" and "a rutted, nonpaved, nonmaintained road." It was always passable, however, unless covered by water after a big rain. The evidence is disputed about whether the road was sufficiently wide to accommodate two adjacent motor vehicles.

Each of the ten witnesses stated that the general public used the road and that none of the ten asked permission to do so. They testified, in addition, that no one ever attempted to stop their use of the roadway and no barriers hindered their use before 1976. Several of the ten witnesses stated that the public's use of the road did not injure the road or the adjacent property, nor did the public's use interfere with any use the owner might wish to make of the property or the road. Nothing in this evidence permits an inference that the public's use of the road was under a claim of right adverse and hostile to that of the owner. Rather, this evidence shows only the public's use and the owner's acquiescence therein.

Certain of the ten witnesses also gave the following evidence: in the 1960's, trash barrels marked "Travis County" were seen *on the point;* between 1970 and 1983, or perhaps at some other time not identified, Travis County collected trash *from the point;* and, on an unidentified date or dates, road graders *believed to be owned* by a public body were seen at an *unspecified place in the vicinity.* It is equally obvious that this testimony does not, because of its indefiniteness, permit an inference that public authorities engaged in acts of dominion over the disputed road indicating that the public use was under a claim of right adverse and hostile to that of the owner.

■ Finally, the evidence contains the testimony of one witness who stated, over Barstow's objection, his conclusion that Travis County maintained the road. *Voir dire* examination of the witness revealed that he had no personal knowledge of whether the County maintained the road and his information in that regard was obtained from a telephone conversation with a County employee. We hold Barstow's objection should have been sustained and it was error for the trial court not to do so, the witness' conclusion being based on the report of another. *Johnson v. Willoughby,* 183 S.W.2d 201 (Tex.Civ. App.1944, writ ref'd) (witness' testimony concerning location of truck driver, based

on "what my employees investigated and found out," properly excluded as hearsay); *Ward v. Wallace*, 175 S.W.2d 611 (Tex.Civ. App.1943, writ ref'd w.o.m.) (officer's statement that woman was injured by a large book that fell from a window, based solely upon what she told officer when he arrived on scene, should be disregarded as a conclusion based on hearsay); *State v. Ohio Oil Co.*, 173 S.W.2d 470 (Tex.Civ.App.1943, writ ref'd w.o.m.) (surveyor's testimony as to location of hill was of no probative value because hearsay when based on another's map alone); *see* Tex.R.Evid.Ann. 602 (prohibiting witness from testifying to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter).

 Without such inadmissible testimony, there is absolutely no evidence of any act of dominion over the property by the public that would permit an inference and *give constructive notice* that the public's use of the road was under a claim of right opposed to that of the owner. The prejudice of the error is therefore obvious. Having obtained the trial court's express ruling on Barstow's hearsay objection, it was not necessary that Barstow repeat the same objection before the jury. Tex.R. App.P. 52(b) (Pamp.1987). While the present case was tried before the effective date of Rule 52(b), we are bound to apply it here, where the briefs were filed and the cause was submitted after its effective date. *Livingston v. Gage*, 581 S.W.2d 187 (Tex.Civ.App.1979, writ ref'd n.r.e.); *Cavitt v. Jetton's Greenway Plaza Cafeteria*, 563 S.W.2d 319 (Tex.Civ.App.1978, no writ). In any event, the rule only adopted the case law that existed before its promulgation. *See Bunnett/Smallwood & Co. v. Helton Oil Co.*, 577 S.W.2d 291 (Tex.Civ.App.1978, no writ); *West Texas Equipment Company v. Walker*, 417 S.W.2d 864 (Tex.Civ. App.1967, writ ref'd n.r.e.); *Crispi v. Emmott*, 337 S.W.2d 314 (Tex.Civ.App.1960, no writ); *J.I. Case Threshing Mach. Co. v. O'Keefe*, 259 S.W. 222 (Tex.Civ.App.1924, writ dism'd).

Even if we suppose, however, that the evidence of the witness was properly admitted in evidence and considered by the jury—insofar as he testified that the road was maintained by the County—this testimony remains insufficient to elevate the evidence to something from which reasonable minds might infer that the County maintained the road with sufficient regularity to conclude that the public's adverse use "was continuous for a period of at least 10 years," as the jury found. The witness simply did not testify when or on what occasions the County maintained the road. Was it once, twice, or a hundred times in the decade of the 1960's, the 1970's, or the 1980's? *When* did the owner's cause of action *accrue* under this evidence? These queries are unanswerable under this evidence. In legal contemplation, there remains no evidence to support the jury's findings, even if the inadmissible evidence be given probative force.

 There remains yet another reason for our holding that the evidence is legally insufficient to support the jury findings upon which a prescriptive title might rest. Under the construction we have given the SSCRA § 525, the period of Colonel Kummer's active service must be deducted in computing any ten-year period of adverse and hostile use by the public. It was Barstow's burden, of course, to show the applicability of § 525. He discharged that burden by his undisputed proof that he acquired title by conveyance from Colonel Kummer in 1976 and that Colonel Kummer was on active service between April 1963 and April 1973. If appellees wished to avoid the legal effect of § 525 and such proof, it was *their* burden to show ten years adverse possession in addition to or outside the period April 1963 to April 1973; that is to say, it was *their* burden to establish ten years adverse possession after the deduction of the period of Colonel Kummer's active service. *See Jolly v. Fidelity Union Trust Co.*, 10 S.W.2d 539 (Tex.1928); Larson, *Disabilities and Actions for the Recovery of Land in Texas*, 16 Sw.L.J. 590, 601–03 (1962); Whitaker, *Tolling and Suspension of the Land Limitation Statutes*, 9 Baylor L.Rev. 389, 397 (1957).

The prescribed period for acquiring a prescriptive title under the ten-year statute cannot even begin *until* the claimant's possession becomes "adverse." Hence, the claimant must prove the fact of possession *and* he must establish that such possession was adverse *throughout* the period required by the statute. *Rushing v. Lanier,* 63 Tex.Civ.App. 40, 132 S.W. 528 (1910, writ ref'd); *Madison v. Fleming,* 283 S.W. 589 (Tex.Civ.App.1926, no writ). We are unable to say that a reasonable fact finder could conclude from the evidence that the public used the road under a claim of right adverse to the owner for a period of at least ten years after his cause of action for possession accrued, especially when the period of Colonel Kummer's active service is excluded.

Nothing in the evidence suggests when public maintenance of the road began, continued, ended, or resumed. Certainly the evidence does not account, in that regard, for the period of Colonel Kummer's active service. Stated another way, the evidence does not permit a reasonable mind to infer when "a cause of action *accrue[d]* to recover" possession of the roadway allegedly "held in adverse possession" by the public, as contemplated by the Legislature in Tex.

Civ.Prac. & Rem.Code § 16.026, *supra* (emphasis added).

For all the foregoing reasons, we sustain Barstow's point of error that the evidence is legally insufficient to support the jury's findings in response to special issues one and two, upon which might rest the trial court judgment for a prescriptive title resulting from ten years adverse possession by the public.

## COMMON–LAW DEDICATION

Appellees contend the judgment below might also rest on their alternative pleading that Wentz, appellant's predecessor in title, "impliedly dedicated" the roadway to public use.[3] There are jury findings consistent with that theory.[4] Appellant contends the evidence is factually and legally insufficient to support those findings.

The theory of "implied dedication" is, we believe, more accurately described by the term "common-law dedication." To sustain their contentions in that regard, appellees were required to establish two ultimate facts: (1) that Wentz *donated* the roadway to the public; and (2) that the public *accepted* it for that purpose.[5] The parties removed the second ul-

---

**3.** The theory of "implied" or common-law dedication is to be distinguished from a formal dedication of a roadway or other property to public use through an *express grant* thereof to the public, following the procedure established in Tex.Rev.Civ.Stat.Ann. art. 974a (1963 & Pamp.Supp.1987). "Implied" or common-law dedication does not result from a grant by the owner but by the application of common-law principles to the circumstances shown by the evidence, as discussed in the text.

It is said that "implied" or common-law dedication operates by way of *estoppel in pais,* whereby the owner is judicially prevented from excluding the public from the roadway or contending that it is a private way subject to his exclusive use and enjoyment. *Poindexter v. Schaffner,* 162 S.W. 22 (Tex.Civ.App.1913, no writ). This is doubtful, however, since the doctrine of common-law dedication was judicially recognized a century before estoppel. 4 Tiffany, The Law of Real Property § 1110, 628–31 (3d ed. 1975). The theoretical foundation is immaterial "[f]or the purpose of the particular case." *Id.* at 629.

**4.** The jury answered "we do" in response to special issues five and six, which inquired as follows:

**SPECIAL ISSUE NO. 5:**
Do you find from a preponderance of the evidence that the acts of Bob Wentz induced the belief that he intended to dedicate the road in question to public use?
You are instructed that intent to dedicate may be shown by express words or clear and unequivocal acts, or may be implied from the acts of the landowner, including inaction on the part of the landowner or long-continued use by the public and the apparent acquiescence of the landowner.
Public use need not be for a specified period of time, only that it be uninterrupted use [sic].
\* \* \*
**SPECIAL ISSUE NO. 6:**
Do you find from a preponderance of the evidence that the public relied upon the acts of Bob Wentz and will be served by the implied dedication of the road in question, if any?
\* \* \*

**5.** *See generally* 4 Tiffany, *supra,* §§ 1101–09, at 574–628; 2 Thompson, The Modern Law of Real Property, § 370, 443–56 (1980); Tigner, *Dedication—A Survey,* 15 Baylor L.Rev. 179 (1963); Childress, *Does Public User Give Rise to a Prescriptive User or Is It Merely Evidence of Dedica-*

timate fact from dispute by a stipulation; they keenly dispute, however, whether the jury validly could infer from the evidence adduced that Wentz donated the roadway to the public.

A valid finding that Wentz donated the roadway to the public required evidence of the following factors: (1) a "clear, unequivocal *act* or *declaration*" by Wentz; (2) of his *"intention* to set it apart for a public use"; and, (3) "that others ... acted in reference to and upon the faith of such manifestation of intention." *Ramthun v. Halfman,* 58 Tex. 551, 553 (1883) (emphasis added). The crucial issue in the present appeal is whether there was evidence of Wentz' intention to set the roadway apart for public use, inferrable from some act or declaration on his part upon which others acted.

■ The evidence is undisputed that the public *used* the roadway to some extent (primarily on a seasonal basis) during the nine years or so of Wentz' ownership. There is, however, no evidence of any *particular* act or declaration by Wentz from which one might infer an intention on his part to set the roadway apart for public

use. Conversely, there is no evidence that Wentz ever protested or disputed the public's use of the roadway during his ownership. The parties on appeal take opposing positions on this question: May Wentz' intention to donate the roadway to the public be inferred by the jury *solely* from evidence that he acquiesced in such public use while he was the owner of the roadway? Wentz' intention is a question of fact upon which appellees had the burden of adducing evidence and persuading the jury. *Viscardi v. Pajestka,* 576 S.W.2d 16, 19 (Tex. 1978).

After careful consideration of the authorities, we believe the correct rules, principles, and distinctions are those we shall now set out.

We should first distinguish the present case from those where the owner's intention was inferred from evidence of his *affirmative acts,* coupled with public use and other factors, and not *solely* from evidence of the owner's *inaction.* In those decisions, the owner's donative intention was made clear and unambiguous by the nature of his *actions* upon which others relied.[6]

---

*tion?,* 6 Tex.L.Rev. 365 (1928); Note, 10 Tex.L. Rev. 239 (1932).

**6.** In *Abbott v. Mills,* 3 Vt. 521, 525 (Vt.1831), we find this statement:

> [T]he act of *throwing open* the property to public use, without any other formality, is sufficient to establish the fact of a dedication to the public; and if individuals, in consequence of this act, become interested to have it continue so, *as by purchasing property,* [etc.], the owner cannot resume it.

(emphasis added). The substance of this decision deals with dedication at common law by reason of the proprietors of a town selling lots on the town square in reference to a plan where the square was marked out and set apart as a *public square.* It was held that the sale of lots on the square, in those circumstances, resulted in a dedication of the square to the public, irrespective of the period of time since the sales were made, the proprietors' intention being plainly manifested by their affirmative acts in selling lots based on the plan. The fact that lots were purchased made the dedication irrevocable.

This Vermont case is obviously immaterial in the present case, just as analogous Texas decisions are. Nevertheless, appellees endeavor to draw from the phrase "throwing open the property to public use" something that the opinion

will not permit. It is plain that it did *not* mean, in the Vermont case, the general commencement of a public use of the property. *It meant, rather, the offering of town lots for sale to the public in reference to the plan of the town drawn up by the proprietors.* Thus, it does *not* mean in the present case, although it was cited in *Owens v. Hockett,* 151 Tex. 503, 251 S.W.2d 957, 958 (1952), in a general survey of the law of common-law dedication, that the owner's mere acquiescence in a public use is sufficient to establish a dedication to the public if some unspecified individuals become interested in having it so. This is made abundantly clear by the omission, in *Owens v. Hockett, supra,* of the phrase "as by purchasing property."

In brief and in oral argument, appellees point to the expression "throwing open the property to public use"; and, on the silent premise that this includes an owner's long-continued acquiescence in public use of his property, they conclude that no more is required to establish a common-law dedication. Appellees thereby transform a metaphor into a rule of law. But a metaphor is certainly not a rule of law; it is not even argument or reason, however useful it may be as a way of giving light and strength to an ordinary description. The *thing being de-*scribed by the Vermont court precludes, of course, the silent premise upon which appellees

We refer to those decisions where the owner was shown to have sold parcels of land in reference to a plat or plan wherein the roadway was displayed as a means of access to the parcels or a public square was shown opposite certain town lots. *See, e.g., Oswald v. Grenet,* 22 Tex. 94 (1858); *State v. Clark,* 161 Tex. 10, 336 S.W.2d 612 (1960); *City of Tyler v. Smith County,* 151 Tex. 80, 246 S.W.2d 601 (1952); *Adams v. Rowles,* 149 Tex. 52, 228 S.W.2d 849 (1950).

■ As a general rule, the owner's donative intention may *not* be inferred from evidence that shows only that the public used the roadway for a long period of time without protest or dispute by the owner. *Greenway Parks Home Owner's Ass'n v. City of Dallas,* 159 Tex. 46, 312 S.W.2d 235 (Tex.1958). The rationale for this general rule is that such evidence, standing alone, remains *equivocal* on the issue of the owner's intention. The public's use of the way and the owner's inaction or acquiescence may, with equal likelihood, indicate either a permissive use by the public, as under a revocable license, *or* an intention on the owner's part to set the way apart irrevocably for public use. Neither conclusion is more likely than the other under such evidence, standing alone.

■ Hence, the general rule holds that "[t]he intention to dedicate must be shown by *something more* than an omission or failure to act or acquiescence on the part of the owner." *Greenway Parks Home Owners Ass'n v. City of Dallas, supra,* 312 S.W.2d at 241 (emphasis added). The "something more" need not rise to the level of an overt act or an explicit declaration demonstrating the owner's donative intention, although such evidence would suffice *a fortiori.* Rather, the requisite intention on the owner's part may be inferred when there is evidence of some *additional* factor that *implies* a donative intention *when considered in light of* the owner's acquiescence in the public's use of the roadway.

The additional factor may be any of a variety of things. One common showing of this kind is that the owner, with apparent knowledge, also acquiesced in the expenditure of public funds by public authorities to adapt, improve, or maintain the roadway for use by the public. When such evidence is joined with that showing a period of uninterrupted public use without protest by the owner, the evidentiary ambiguity dissolves and the trier of fact *may* validly infer from the evidence a donative intention on the owner's part. This additional showing (expenditure of public funds by public authorities to facilitate public use) is, of course, inconsistent with continued private ownership of the roadway. It is a factor in all the decisions, save one, cited to us by appellees.

■ Evidence showing public maintenance does not, however, exhaust the possibilities of showing the "something more" required by *Greenway Parks.* In *Viscardi v. Pajestka, supra,* the remaining decision cited by appellees, the donative intention of the owner was clearly and unequivocally demonstrated by his affirmative act; that is, his *express* "dedication" of the way *in a deed,* using that very word, the dispute being whether he might validly dedicate the way to be used by a few individuals while excluding the public at large. In *Lindner v. Hill,* 691 S.W.2d 590 (Tex.1985), the roadway was shown to be the route used to and from a school built by the owner himself for public use. In *Las Vegas Pecan & Cattle Co. v. Zavala County,* 682 S.W.2d 254 (Tex.1984), the owner's predecessor in title testified that he considered the roadway to be a public road while he owned the property. In *Gilder v. City of Brenham,* 67 Tex. 345, 3 S.W. 309 (1887), the owner himself told his purchaser that the way was reserved for public use. In *Owens v. Hockett,* 151 Tex. 503, 251 S.W.2d 957 (1952), the owner was shown to have fenced off the roadway from the remainder of his land. In *Parisa v. City of Dallas,* 83 Tex. 253, 18 S.W. 568 (1892), the owner demanded and received a reduction in his purchase price commensurate with

---

rely. Its decision in the case is irrelevant here (just as many similar Texas decisions are) because it is based on an owner's affirmative acts

in selling town lots in reference to a plat that expressly reserved certain areas for public use.

the area of the roadway. In some of these decisions public funds were shown to have been expended on the roadway, but in all of them at least *one* additional factor was shown to remove the logical deadlock that exists when the evidence shows only that the public used the way for a long period of time with the owner's acquiescence.

We are satisfied that the rule stated in *Greenway Parks* is, beyond doubt, the general rule in our State's jurisprudence. We reject appellees' contention that *Greenway Parks* was impliedly overruled by the later decisions in *Lindner* and *Las Vegas*. As explained above, in each of those two decisions there *was* ample evidence of the "something more" that *Greenway Parks* required. *Lindner* and *Las Vegas* thus complied with *Greenway Parks* and in those cases the Supreme Court did not decide the issue differently than would have been the case under *Greenway Parks*. Moreover, we believe it highly doubtful that the Supreme Court of Texas would overrule such a fundamental and long-standing rule of property law merely by implication—that is to say, without discussion and without an explicit holding to that effect.

It must be observed that one decision cited by appellees contains language that is facially contrary to the rule of *Greenway Parks*. We refer to *Jezek v. City of Midland*, 605 S.W.2d 544, 549 (Tex.1980) where the Court stated:

> It is evidence of a landowner's intention to dedicate if he permits the public to use his land as a highway. *Dunn v. Deussen*, 268 S.W.2d 266 (Tex.Civ.App.—Fort Worth 1954, writ ref'd n.r.e.).

This statement, we believe, cannot possibly imply that the evidence *will* support a finding of donative intention when it shows *only* that the landowner permitted the public to use his land as a highway. The implication is, in fact, contradicted by the very decision cited as authority—*Dunn v. Deussen, supra.*

*Deussen* presumes the validity of the general rule that has prevailed uninterrupted from *Ramthun v. Halfman, supra,* in 1883, until *Greenway Parks* in 1958.

What *Deussen* provides is simply a corollary to that general rule—a corollary designed to meet a particular anomaly: evidence of long-continued use by the public raises a *presumption* of dedication by the owner *when the origin of the public use and the ownership of the land at the time it originated cannot be shown, one way or the other, due to the lapse of time. Dunn v. Deussen, supra,* at 269. The *Jezek* decision is thus not applicable in the way appellees would have us apply it, for they would give it a naked meaning that no Supreme Court decision has ever countenanced: that evidence of public use, *standing* alone, *is* sufficient to support a finding of donation by the owner.

For *Deussen* to be applicable, the origin of the public use and the ownership at that time must be "shrouded in obscurity, and no proof can be adduced showing the intention of the owner in allowing the use." *Dunn v. Deussen, supra,* at 269. Such is not the case here under appellees' own pleadings, wherein they alleged that *Wentz* as owner impliedly dedicated the roadway to public use, and the jury's findings that *he* did so. It was not appellees' theory that ownership was uncertain at the time public user began. They proceeded on the opposite theory that Wentz himself made the dedication while he owned the property. We hold, therefore, that the present case does not fall within the *Deussen* corollary.

We have held above that there was no admissible evidence that public funds were expended to adapt, improve, or maintain the roadway for public use. The surviving evidence shows only that the public used the roadway, during the nine years or so of Wentz' ownership, without protest or dispute on his part. Under the general rule of *Greenway Parks,* this is legally insufficient to permit the jury finding. We hold accordingly.

## PARTITION OF FISHER RESERVE NO. 2

In two points of error, Barstow assails that part of the trial-court judgment that orders a partition of Fisher Reserve No. 2 on the basis of the County and Barstow

owning fractional interests therein of 55% and 45% respectively. In his first point, Barstow contends that the partition decree could not be entered because not all the owners of undivided interests were parties to the suit. In the second point, Barstow contends the fractional interests assigned to the County and him, that is, 55% and 45% respectively, were not supported by any evidence.

*Absent Parties.* Barstow's contention that some owners of an undivided interest were not parties depends upon his premise that their conveyances of Fisher Reserve No. 2 to the County were invalid, leaving title to their undivided interests in these owners. We hold the conveyances to be valid. Hence, in bringing suit, the County was not "representing" them but was asserting its own title in Fisher Reserve No. 2.

Barstow argues that the conveyances were invalid because made without the joinder of all the owners of undivided interests in Fisher Reserve No. 2. He infers from *Chenowth Bros. v. Magnolia Petroleum Co.,* 129 S.W.2d 446 (Tex.Civ.App.1939, writ dism'd judgmt cor.) a rule of law that one cotenant may not convey an undivided interest without the consent of his cotenants. We hold there is no such rule of law.

■■■■■ One cotenant may freely convey his interest in the common property *as long as he does not prejudice the rights of his cotenant in the premises.* *Peterson v. Fowler,* 73 Tex. 524, 11 S.W. 534, 535 (1889); *Lake v. Reid,* 252 S.W.2d 978, 982 (Tex.Civ.App.1952, no writ); 86 C.J.S. "Tenancy in Common," § 120, p. 531 (1954). In any case, such a conveyance is not void but only voidable at the instance of the nonconsenting cotenant. *Gaines v. Lee,* 175 S.W.2d 728 (Tex.Civ.App.1943, writ ref'd w.o.m.).

In *Chenowth,* it was held that one cotenant may not *dedicate* a road easement without the consent of the other. *Chenowth* is consistent with the foregoing general rule because one cotenant's express *dedication* of an easement to the public prejudices, as a matter of law, the rights of the nonconsenting cotenant owning an *un-*

*divided* interest in the common property. This is not so in the case of one cotenant's conveyance of his entire interest, for his grantee simply succeeds to the grantor's right, title, and interest in the common property.

Barstow does not contend and did not obtain a finding that he was prejudiced by the conveyances of which he complains, by virtue of which Travis County succeeded to the right, title, and interest of Barstow's former cotenants. Instead, Barstow relies on the asserted rule of law that one cotenant simply may not convey his interest without the joinder of his cotenants. Believing there is no such rule, we hold the conveyances may not be held invalid on that ground.

■■■■ Barstow argues next that the conveyances were invalid under a rule of law that holds a public entity may not possess an undivided interest in real property in which private persons simultaneously hold an undivided interest. We disagree. Subject to statutory variations of the general rule, the State has the same powers and rights as private persons in acquiring, holding, using, and disposing of real property. *Conley v. Daughters of the Republic,* 106 Tex. 80, 156 S.W. 197 (1913).

■■■■ The County, in the present case, holds title subject to legislative control. *Robbins v. Limestone County,* 114 Tex. 345, 268 S.W. 915 (1925). We cannot find that the Legislature has forbidden the cotenancy claimed by the County in this case. Instead, the Legislature has expressly provided that:

> *All* deeds, grants, and conveyances ... to any county ... shall be good and valid to vest in such county in fee simple or otherwise all such right, title, interest and estate *as the grantor ... had at the time of the execution thereof* in the lands conveyed and *was intended thereby to be conveyed.*

Tex.Rev.Civ.Stat.Ann. art. 1576 (1962) (emphasis added).

It is undisputed that the grantors in the conveyances in issue had and intended to convey to the County an undivided interest

in Fisher Reserve No. 2. We find no authority that would forbid the County from acquiring such an estate; art. 1576 expressly permitted the County to do so. We therefore hold that the conveyances may not be held invalid on the ground that the County was incompetent to acquire and hold an undivided interest in the tract with private persons.

■■■ Finally, Barstow contends that Travis County judicially admitted the invalidity of the conveyances whereby it acquired an undivided interest in Fisher Reserve No. 2. This contention is based on the following portion of the County's motion for summary judgment, wherein it speaks of Barstow's opposing motion:

> The gist of [Barstow's] Motion was that there could be no joint ownership of realty by public entities and private individuals. [The County] *does not disagree with this statement of the law,* but contends that it has a right to pursue partition and accounting on behalf of the Wentz heirs pursuant to Assignments from the Wentz heirs to Travis County to maintain all causes of action involving … Fisher Reserve No. 2 on their behalf against [Barstow].

(emphasis added). However, the County's motion continues with arguments that unequivocally dispute that Barstow had correctly stated the law. We consequently do not view the emphasized expression to be so clear and unequivocal, in context, as to amount to a judicial admission. *See Houston First American Savings v. Musick,* 650 S.W.2d 764, 768–69 (Tex.1983). This is especially true in light of the County's trial petition where the County unequivocally claims its 55% ownership interest under conveyances from the Wentz heirs. Furthermore, the judicial admission contended for was a statement about the rule of law we have previously rejected, rather than an adjudicative fact. *United States Fidelity & Guaranty Co. v. Carr,* 242 S.W.2d 224, 229 (Tex.Civ.App.1951). We therefore hold the conveyances to Travis County may not be held invalid on the grounds of a judicial admission by the County.

*No Evidence.* The trial-court judgment orders a partition of Fisher Reserve No. 2 on the basis of the County and Barstow owning 55% and 45% undivided fractional interests respectively. Barstow contends there is no evidence to support these percentage determinations. In evaluating his point of error, we are bound to review the evidence in a light most favorable to the judgment below, disregarding all contrary evidence. *James v. Drye,* 159 Tex. 321, 320 S.W.2d 319 (1959).

Barstow contends that he is entitled as a matter of law to more than the 45% undivided interest determined by the trial court. He reasons that he acquired the extra increment by virtue of a conveyance dated February 24, 1982, and executed by William H. Wentz "Individually and as Executor of the Estate of Lucile B. Wentz, Deceased." In that deed, Wentz conveyed Fisher Reserve No. 2 (and other properties) *"subject to* the matters set forth and described on Exhibit 'B' attached" to the deed and incorporated therein (emphasis added).

In Exhibit "B" various matters are set forth. The first two are an easement in favor of Pedernales Electric Cooperative, Inc. and the rights of the Lower Colorado River Authority to inundate the properties conveyed, and all rights incident thereto, both of which are referred to by reference to recorded instruments in the Deed Records of Travis County. Next, there appears a list of 23 individuals. The conveyance of Fisher Reserve No. 2 and the other properties is made subject to the "ownership rights" of these 23 individuals. Finally, the exhibit concludes by stating that the "ownership rights" of Roxie B. Wentz, Gertrude W. Messmer, and William H. Wentz *are* conveyed by the deed, but those of three other named individuals are *not.* Apparently, these statements were meant to apply to all the properties conveyed in the deed.

There is no mention in the deed or the exhibit of the right, title, and interest of some 16 descendants of Lucille Wentz, deceased. Barstow contends the deed conveyed the entire interests of all who might take under Lucille Wentz except those in-

terests *expressly excluded* from the scope and effect of the conveyance. Hence, Barstow contends he acquired by the deed the right, title, and interest of the 16 descendants who were omitted.

■ We believe the deed to be ambiguous on the points in issue. In light of the terms of the deed and the surrounding circumstances shown in the evidence, we believe the trial court was entitled to construe the deed as a matter of law, neither party having alleged that it was vague or ambiguous. *Community Development Services, Inc. v. Replacement Parts Mfg.*, 679 S.W.2d 721 (Tex.App.1984, no writ).

Title to the property of Lucille B. Wentz vested at death in her devisees or legatees. William H. Wentz' power to convey any part of such property, as her executor and contrary to that general rule, depended upon a showing of the exceptional circumstances named in Tex.Prob.Code Ann. § 37 (Supp.1987). Barstow did not establish such exceptional circumstances. Accordingly, we may not say that the trial court erred as a matter of law in the construction it gave the deed to Barstow. We therefore overrule his point of error.

We accordingly reverse that part of the trial-court judgment establishing a public easement across Barstow's lots and affirm the remainder of the judgment.

Affirmed in Part; Reversed and Rendered in Part.

ABOUSSIE, J. not participating.

APPENDIX

LOT 24A

DISPUTED ROADWAY

COUNTY ROAD

FISHER RESERVE NO. 2

CAUSEWAY

LCRA

LCRA

Waterline at 670' elevation ——————

Waterline at 681' elevation ·················