

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00056-CV

———————————————

ROB HUGHITT, Appellant

V.

STEVEN BRAMLETT, Appellee

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. C2020128

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Walker

**MEMORANDUM OPINION**

This is an appeal from a one-day bench trial on a claim for breach of a contract involving a tract of real property that is subdivided into four lots (the Property), and on which two homes are located, each home being situated on two of the four lots. In the judgment, the trial court found that the Legal Agreement entered into between Appellant Rob Hughitt and Appellee Steven Bramlett is valid and enforceable and that, pursuant to the Agreement, the Property is "mutual property" of Hughitt and Bramlett. Based on Bramlett's claim of anticipatory repudiation of the Agreement's sale provision, the trial court ordered Hughitt "to sell whichever of the two [lots] he would so desire, by placing [them] on the market within 30 days from August 18, 2021," and after selling those two lots, to "convey the other . . . two" to Bramlett.[1] On appeal, Hughitt contends that the trial court erred by finding that he and Bramlett "jointly" owned the Property, erred by rendering judgment "forcing [him] to sell a tract of land," and erred by ordering a sale deadline—September 17, 2021—that occurred before the date the trial court signed the judgment on November 17, 2021. We affirm.

---

[1]The trial court also denied Hughitt's request for contribution from Bramlett for costs incurred in building the two homes on the Property.

## I. PROCEDURAL BACKGROUND AND TRIAL EVIDENCE

Hughitt and Bramlett entered into the following Agreement in September 2016:

Let it hereby be known that the lots having been purchased by Rob Roy Hughitt from Victoria and Steven Wayne Bramlett, currently located and identified as lots 53, 54 and 55, 56 located in the Wildwood Estates edition in Granbury, Texas [the Property], do[] currently possess two homes, one being on lots 53 and 54 adjoined and another home being located on lots 55 and 56 adjoined. The two homes and the properties on which they are located, and together having been mutually constructed by Rob Roy Hughitt and Steven Jeffery Bramlett commensurate, are each considered as mutual property with mutual expense and responsibility until such time that one home has been sold. **With the culmination of the sale of either of the subject homes, the home remaining un-sold becomes the full and total possession and responsibility of Steven Jeffery Bramlett both in word and in title for said home and inclusive of those lots on which that home stands.**

On July 8, 2020, Bramlett sued Hughitt for breach of the Agreement and breach of fiduciary duty; his petition also included a declaratory-judgment claim. Bramlett requested specific performance of the Agreement, partition of the Property, and damages in the alternative. In his answer, Hughitt raised the statute of frauds as an affirmative defense[2] and, alternatively, failure of consideration. He also filed a counterclaim seeking to remove the lis pendens that Bramlett had filed in the Hood County property records.

---

[2]Hughitt's counsel repeatedly objected that the Agreement is unenforceable under the statute of frauds. But on appeal, Hughitt does not challenge the trial court's declaration that the Agreement is valid and enforceable other than to claim it is unenforceably ambiguous.

At trial, the evidence focused on the circumstances leading to the Agreement's signing and on the parties' conduct thereafter.

Victoria Bramlett—Bramlett's mother—testified that she purchased the Property in 1985 and that she had promised it to Bramlett. But on September 26, 2016, Victoria and her husband conveyed the title to the Property to Hughitt, her brother, for $9,500.

According to Victoria, she signed the deed to Hughitt at his request: "When I went to the title office, I was not signing a document signing it over to my son. It was saying I had to sign it over to Rob Hughitt, and that's when I went and drafted this document [the Agreement] because the property was my son's." Thus, before signing the deed to Hughitt, Victoria drafted the Agreement, talked to both Hughitt and Bramlett about it, and submitted it to the title company.

Bramlett signed the Agreement on September 20, 2016, and Hughitt signed it on September 22, 2016. Victoria said she would not have conveyed the Property to Hughitt if he had not first signed the Agreement.

Victoria further testified that before Hughitt and Bramlett signed the Agreement, she viewed the homes that had already been constructed on the four lots; one home had been built on lots 53 and 54 (Home 1), and the other had been built on lots 55 and 56 (Home 2).[3] She noticed that both homes had been substantially

---

[3]Victoria estimated that Home 1 was valued at around $140,000 and that Home 2 was valued at around $125,000.

4

completed,[4] that Home 1 "was simply in need of some trim work and . . . appliances," and that Home 2 "was complete with appliances in it."[5] According to Victoria, when Hughitt and Bramlett signed the Agreement, "other parties" were living in Home 1[6] and Bramlett was living in Home 2. According to Bramlett, however, he moved into Home 2 in January 2017.[7] At the time of trial, Bramlett was incarcerated.[8]

According to Bramlett, during construction of the homes, Hughitt was to provide the materials while Bramlett "was to stay on the job site and build the houses." Bramlett worked for Hughitt, who deducted taxes for Home 2 from Bramlett's paycheck.[9] But Bramlett lost his job when he was incarcerated.

---

[4]Bramlett also testified that Home 1 and Home 2 had been substantially completed by the time he signed the Agreement.

[5]Two other witnesses testified that the homes were substantially complete at the time the parties signed the Agreement.

[6]According to Bramlett, Hughitt had rented out Home 1 continuously since then, and he had not paid Bramlett any part of the rental income. Hughitt testified that he charged $1,200 monthly as rent.

[7]Bramlett's testimony is confusing and somewhat inconsistent in that he also testified that different people had lived in the house with his permission, but he did not say when those people lived there.

[8]Sometime before filing suit, Bramlett was arrested for DWI.

[9]According to Hughitt, he deducted only $61 a month for seven months. Hughitt also paid Bramlett's water bill and deducted money for that.

After Bramlett's DWI arrest, Hughitt filed a forcible-detainer suit to oust Bramlett of possession of Home 2.[10] According to Victoria, Hughitt told her at the time that "his intent was to put both of the homes into a trust that would be in effect even after he died and that the houses would never be sold and that he was going to give $200 a month to Sarah Bramlett," who is Bramlett's daughter. Hughitt did not deny having this discussion with Victoria, but he explained that he had told her, "[W]e need to . . . . resolve . . . this . . . problem because [Bramlett] never paid anything for four years, never paid the taxes, never paid the electric bills, never paid any part of any construction. I need some resolution to some money that is owed to me." Although the forcible-detainer suit was eventually dismissed, it precipitated this suit.

Bramlett explained the Agreement thusly: "Our deal was two houses were to be constructed. One was to be sold out of the company owner [sic] of the property that was not sold." Bramlett agreed, however, that the Agreement does not provide a date by which Hughitt was to sell one of the homes; he expressly stated, "There was no sale date."[11] But he then clarified, "[A]s far as I knew, as soon as they were constructed, they were both to be put up for sale, and whichever one sold first, the other one became my property." Bramlett testified that Hughitt had breached the Agreement because it "stated that the house be sold."

---

[10]However, according to Hughitt, Bramlett was not actually living in Home 2 at the time.

[11]He also agreed that the Agreement does not define "mutual expense" or "mutually constructed."

6

Hughitt testified that he had been a builder in Hood County for almost forty years. He testified that he does not start construction on a home before obtaining title to the property because to do so would cause any first-lien position to be null and void. When asked whether he had begun any work on Home 1 and Home 2 before September 26, 2016, he answered, "I don't believe so." According to Hughitt, when he bought the land from Victoria, it had "two old mobile homes and a three-stall . . . carport" on it. It took him a month to remove them and clear the lots so that he could begin building the homes. At the time, Bramlett was working for him.

After the lots were cleared, about a month after Hughitt bought the Property, his crews began to build Home 1 and Home 2. Hughitt denied that Home 1 and Home 2 had been mutually constructed as stated in the Agreement. According to Hughitt, Bramlett did some plumbing work on the homes, for which Hughitt paid him hourly, and Bramlett moved into Home 2 after they were both completed.

According to Hughitt, he signed the Agreement because he was going to "take those two abandoned mobile homes and . . . get rid of them, take the four lots[,] and build two houses on the lots." Hughitt said that the Property "needed to be cleaned up" and that he agreed "to buy the lots and build two houses on them and then go from there." When asked why he signed the Agreement, Hughitt said, "[T]he agreement was . . . that if we sold one of them, we would get part of the proceeds if everything went good."

Hughitt testified that Bramlett never contributed financially to the Property. Instead, Bramlett lived in Home 2 for only three or four months; the rest of the time, other family members lived there. Hughitt also testified that when he signed the Agreement, he had not been able to read it because he is dyslexic.[12] He said he never had any intent to sell or convey property when he signed the Agreement, nor did he at the time of trial.

Despite not filing a pleading seeking such relief, Hughitt asked Bramlett to sell "his house . . . that he claimed." But Hughitt wanted his "proceeds" from that sale: $85,000 plus four years of rent at $1,200 per month.

At the close of trial, the judge stated his ruling on the record, specifically finding that "there is a valid and enforceable agreement that is titled 'Legal Agreement,'" that "[b]y the terms of the [A]greement, . . . the [P]roperty is mutual property of . . . Hughitt and . . . Bramlett," and "that . . . Hughitt is to sell whichever of the two properties he would so desire." The trial court then asked the parties how much time would be needed to complete the sale, and Bramlett's counsel suggested "a reasonable amount of time." The trial court then ruled "that whichever lot . . .

---

[12]Hughitt also testified that he was nevertheless able to maintain his construction business by having his secretary and others read documents to him. On cross-examination, he admitted that the title company representative had read the Agreement to him. *See, e.g.*, *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015) ("Instead of excusing a party's failure to read a contract when the party has an opportunity to do so, the law presumes that the party knows and accepts the contract terms.").

Hughitt desires [is to] be put on the market within 30 days of today's date, and the other of the two will then be conveyed to . . . Bramlett." Although the trial court made its ruling on August 18, 2021, it did not sign a written judgment until November 17, 2021.

After the trial court signed the judgment, Hughitt filed a motion for new trial, in which he contended that the trial court could not have ordered him to sell one of the homes because the Legal Agreement did not provide for such a remedy; he also argued that the judgment imposes an impossible requirement: "It is impossible to comply with a September 17 deadline on November 17."

## II. EVIDENCE SUPPORTS "MUTUAL PROPERTY" FINDING

In his first issue, Hughitt argues that the trial court erred by finding that the Property "is mutual property of" the parties because the Agreement is ambiguous as to the percentage owned by each of them and because no evidence was presented about their respective ownership percentages from which the trial court could make such a finding of mutual ownership.

Hughitt bases much of his argument in this issue and his second issue on the premise that any partition of the Property was error. But although Bramlett had pleaded for partition, the trial court did not employ the partition process. *See* Tex. R. Civ. P. 756–70 (partition-specific procedural rules); *see also* Tex. Prop. Code Ann. §§ 23.001-.006 (statutes governing partition suit). Instead, the trial court granted

9

relief on Bramlett's claim for anticipatory breach with specific performance as the remedy.[13]

As Hughitt points out, the evidence showed that he holds legal title[14] to the Property under a deed from Victoria. But the Agreement itself acknowledges that title. According to the Agreement, in light of the fact that the homes were "mutually constructed," Hughitt was to hold his legal title for both his and Bramlett's benefit, "as mutual property with mutual expense and responsibility," until the sale of either Home 1 or Home 2, at which point Bramlett's legal title to the remaining home would ripen. Thus, the trial court did no more than make a finding based on the Agreement's plain language.[15] We therefore overrule Hughitt's first issue.

---

[13]For that reason, *Barstow v. State*, a partition case upon which Hughitt relies, is inapposite. 742 S.W.2d 495, 510 (Tex. App.—Austin 1987, writ denied).

[14]*See Longoria v. Lasater*, 292 S.W.3d 156, 165 (Tex. App.—San Antonio 2009, pet. denied) (op. on reh'g) (explaining title types: record, legal, and equitable).

[15]In his brief, Hughitt refers to the Agreement as "unenforceably ambiguous." To the extent his issue could be liberally construed to include an argument that the Agreement failed to include an essential term by omitting the exact ownership percentages meant by "mutual property with mutual expense and responsibility," we disagree. The Agreement's terms are "sufficiently definite to 'enable a court to understand the parties' obligations'" and to provide the proper remedy upon a breach. *See Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000), and citing Restatement (Second) of Contracts § 33(2) (1981)). Although Hughitt made other challenges to the Agreement's enforceability in the trial court, he has abandoned them here.

Hughitt also states in the argument summary of his brief, without support, that "the purported agreement was not supported by consideration." To the extent that this sentence could be construed as raising the issue, we note that Hughitt argued in

10

### III.  ORDER TO SELL PROPERTY PROPER

Hughitt contends in his second issue that the trial court erred by ordering him to sell one of the two homes because the Agreement does not require such a sale and because "[t]he trial court added a deadline . . . that was absent from the document." According to Hughitt, because the Agreement contained no time by which Hughitt was required to sell one of the homes—if required to sell at all—"any duty to transfer ownership [of the other home to Bramlett] was not ripe."

Hughitt does not challenge the trial court's implied finding that he breached the Agreement.  *See Kelly v. Tracy*, No. 01-18-00913-CV, 2022 WL 2837335, at \*5 (Tex. App.—Houston [1st Dist.] July 21, 2022, no pet.) (mem. op.) (explaining that anticipatory breach, or repudiation, of a contract is "a positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance").  Instead, he challenges the availability of specific performance as a remedy.

---

the trial court that the Agreement was not supported by consideration because Bramlett had failed to perform his obligations to mutually construct the homes and because he had not shared in the Property's expenses.  *See Yu v. Lu*, No. 03-22-00036-CV, 2022 WL 2056362, at \*4 (Tex. App.—Austin June 8, 2022, pet. denied) (mem. op.) (explaining difference between lack of consideration and failure of consideration, noting that the latter "is a defense to a party's prevailing on a cause of action brought under a contract, but . . . does not render a contract unenforceable or invalid").  But the trial court was entitled to believe the other witnesses' testimony over Hughitt's.  *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

Specific performance is an equitable breach-of-contract remedy that substitutes for monetary damages when they would be inadequate. *Lockheart Chapel, Inc. v. Katim Endeavors, Inc.*, No. 02-21-00405-CV, 2022 WL 3456834, at *3 (Tex. App.—Fort Worth Aug. 18, 2022, no pet.) (mem. op.). The specific performance ordered must be according to the contract's terms. *See Hubler v. Oshman*, 700 S.W.2d 694, 699 (Tex. App.—Corpus Christi–Edinburg 1985, no writ); *Brantley v. Etter*, 662 S.W.2d 752, 757 (Tex. App.—San Antonio 1983), *writ ref'd n.r.e.*, 677 S.W.2d 503 (Tex. 1984).

In effect, Hughitt argues that the Agreement does not contemplate a sale of one of the homes but merely protects Bramlett in the event they ever did decide to sell one. Bramlett, on the other hand, testified that it was always contemplated that one of the homes would be sold, giving him legal title to the other home at that time.

We construe a contract's words in context, which is not "confined to the two-dimensional contractual environs in which the words exist but may also encompass 'the circumstances present when the contract was entered.'" *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018) (quoting *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)). Facts and circumstances surrounding the contract's execution can aid in construing its language, but such evidence may give those terms only meanings to which they are reasonably susceptible. *Id.* at 765.

The Agreement's language contemplates that one of the homes will be sold although Hughitt is correct that it does not give a timeframe by which such a sale was to occur. Indeed, the parties agreed that the Property would be "mutual property"

12

until that time. But the evidence shows that after several years of their mutual arrangement, Hughitt—contrary to the Agreement—expressed an intent never to sell one of the homes, thus making it impossible for Bramlett to ever obtain full legal title of the unsold home; in other words, Hughitt expressed an intention never to comply with the sale term of the Agreement. The Agreement does not contemplate that Hughitt would be able to retain sole legal title of the Property indefinitely. *See Allegiance Hillview, L.P. v. Range Tex. Prod., LLC*, 347 S.W.3d 855, 869 (Tex. App.—Fort Worth 2011, no pet.) ("[W]here no time for performance is stated in a contract, the law will imply a reasonable time."). Thus, we conclude that the relief granted by the trial court was in conformance with, rather than contrary to, the Agreement's terms. *See Hubler*, 700 S.W.2d at 699.

We hold that the trial court did not err by ordering Hughitt to sell one of the homes and convey title of the other home to Bramlett. We therefore overrule Hughitt's second issue.

## IV. WRITTEN JUDGMENT COMPLIES WITH ORAL RENDITION

In his third issue, Hughitt contends that the judgment is void because it orders him to do an impossible task: market and sell one of the homes on a date preceding the date the trial court signed the judgment.

Hughitt cites constructive-contempt law holding that a judgment of civil contempt imposing a coercive restraint is void if the conditions for purging the contempt are impossible to perform. *See, e.g., In re Smith*, 354 S.W.3d 929, 930 (Tex.

13

App.—Dallas 2001, orig. proceeding). But this authority is inapposite; Bramlett has not sought to enforce the judgment by contempt.

Although the judgment was signed on November 17, 2021, the trial court orally rendered judgment at the August 18, 2021 hearing: "So what the Court is going to rule is that whichever lot . . . Hughitt desires [is to] be put on the market within 30 days of today's date, and the other of the two will then be conveyed to . . . Bramlett." *See Dunn v. Dunn*, 439 S.W.2d 830, 832 (Tex. 1969) ("[A] judgment is 'rendered' when the decision is officially announced either orally in open court or by memorandum filed with the clerk."). Thus, the written judgment reciting that "Hughitt is to sell whichever of the two properties he would so desire, by placing it on the market within 30 days from August 18, 2021, the date of the hearing," merely restated the trial judge's oral rendition and was a ministerial act. *See id.*; *Dorrough v. Cantwell*, No. 2-05-208-CV, 2006 WL 2034016, at *3 (Tex. App.—Fort Worth July 20, 2006, pet. denied) (mem. op.); *see also In re Bennett*, 960 S.W.2d 35, 38 (Tex. 1997) (orig. proceeding) (noting that the date of signing of a judgment or order is for determining plenary power and appellate timetables). Hughitt did not attempt to supersede or stay the trial court's ruling.

At the time the trial court rendered its ruling, the date for putting one of the homes on the market for sale had not yet passed. That Hughitt did not timely comply with the court's ruling or seek to have it stayed, or that Bramlett did not initiate contempt proceedings during the trial court's plenary power, does not make the

14

judgment void. *See In re D.S.*, 602 S.W.3d 504, 512 (Tex. 2020) (explaining that a judgment is void "when it is apparent that the court rendering judgment 'had no jurisdiction [over] the parties or property, no jurisdiction [over] the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act'" (quoting *Browning v. Prostok*, 165 S.W.3d 336, 346 (Tex. 2005)).

Accordingly, we overrule Hughitt's third issue.

## V. CONCLUSION

Having overruled Hughitt's three issues, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered: December 8, 2022

15