Malcolm TURNER, Appellant,

v.

PV INTERNATIONAL CORPORATION
and R.W. Forsythe, Appellees.

No. 05–87–01123–CV.

Court of Appeals of Texas,
Dallas.

Dec. 19, 1988.
Rehearing Denied Feb. 16, 1989.

Gerald R. Powell, Waco, Robert D. Allen, Barbara E. Pusch, Dallas, for appellant.

G.H. Kelsoe, Jr., Jeffrey L. Clark, Dallas, for appellees.

Before ENOCH, C.J., and McKAY[1] and BISSETT[2], JJ.

BISSETT, Justice.

PV International Corporation sued Malcolm Turner, individually, and the firm of Turner, Mason & Solomon, a partnership, for damages based on an alleged breach of contract to raise $750,000.00 capital for PV International Corporation, for fraud and for breach of fiduciary duty. R.W. Forsythe sued Malcolm Turner for the alleged alienation of affection of his wife, Barbara Forsythe. No motion to sever the two causes of action was filed in the trial court. Turner answered with a general denial and affirmative defenses of statute of frauds, statute of limitations, judicial estoppel, collateral estoppel and release. Trial was to a jury, which answered all issues favorably to PV International Corporation and R.W. Forsythe, respectively. The judgment decreed that PV International recover $1,250,000.00 from Malcolm Turner, and that R.W. Forsythe, individually, recover $1,000,000.00 from Malcolm Turner. An appeal from that judgment has been perfected by Malcolm Turner, defendant in the trial court. We reverse.

## BACKGROUND

This suit was originally filed on May 6, 1980, in the 162nd District Court of Dallas County. Judge Dee Brown Walker presided at the trial, which commenced on July 16, 1984. On December 31, 1984, Judge Walker granted defendants' (Malcolm Turner and the firm of Turner, Mason & Solomon) motion for judgment non obstante veredicto and rendered judgment that plaintiffs PV International Corporation and R.W. Forsythe take nothing. Then, on April 15, 1985, Judge Joe Burnett, sitting for Judge Catherine Crier, judge of the 162nd District Court, on his own motion set aside the judgment non obstante veredicto, and, on the same day, signed a judgment which decreed: (1) that PV International Corporation recover $570,000.00 against Malcolm Turner and the firm of Turner, Mason & Solomon; (2) that PV International Corporation further recover from Malcolm Turner the sum of $830,000.00; and (3) that R.W. Forsythe recover $1,000,-000.00 from Malcolm Turner. Judge Crier, by order signed on April 29, 1985, on her own motion set aside the order of Judge Burnett which set aside the judgment non obstante veredicto previously rendered by Judge Walker.

When PV International first filed the appeal, this Court on its own motion raised the issue of jurisdiction. This Court concluded that it did not have jurisdiction, reasoning that "there is not a final and appealable judgment." *See PV International Corporation v. Turner, Mason & Solomon,* 700 S.W.2d 21, 22 (Tex.App.—Dallas 1985, no writ). Accordingly, the appeal was dismissed for want of jurisdiction.

Judge Crier recused herself from further service in the case by order signed on

---

1. The Honorable Connally McKay, Justice, retired, Court of Appeals, Twelfth District of Texas at Tyler, sitting by assignment.

2. The Honorable Gerald T. Bissett, Justice, retired, Court of Appeals, Thirteenth District of Texas at Corpus Christi, sitting by assignment.

March 24, 1986. The case was transferred to the 160th District Court of Dallas County by order signed on March 26, 1986. Judge Joe Bailey Humphreys signed the final judgment in this case on July 14, 1987. The judgment was solely against Malcolm Turner. PV International does not complain by a cross-point of the failure by Judge Humphreys to decree any recovery against the partnership of Turner, Mason & Solomon. We do not further notice the suit against such partnership.

## PV INTERNATIONAL'S SUIT AGAINST TURNER

PV International Corporation (PV International) is a foreign corporation and was chartered in the Cayman Islands in 1974. R.W. Forsythe was president and sole stockholder until 1983, when he sold his stock to a third party. The corporation was engaged in the business of manufacturing and selling explosives (nonmilitary) to third world countries. In May 1977, it had plants in Malaysia and a tentative contract to build a plant in Ecuador. At that time, it was out of money and desperately in need of additional capital.

Forsythe and his wife, Barbara Forsythe, met Malcolm Turner and his wife, JoAnn Turner, in 1969. They became friends and socialized with each other. In late 1969, Forsythe was attempting to raise capital for his company named Kinetics International Corporation and talked to Turner about raising money for the corporation. Some kind of an arrangement was made between the two; later a dispute arose concerning the amount of stock which Turner was to receive for his services. The parties eventually settled the dispute, and a certain amount of stock was issued to Turner. Forsythe later sold Kinetics International Corporation.

On May 13, 1977, the Turners invited the Forsythes to dinner at a restaurant located at Chandler's Landing, a yacht club. At the dinner, Forsythe told Turner about the financial difficulties being experienced by PV International and that additional capital was needed. Forsythe testified that Turner then told him that he could easily raise $750,000.00, the capital needed by PV International. Following the dinner, Turner suggested that Forsythe prepare a "proposal" showing all relevant facts of the corporation and explaining how the $750,000.00 would be spent. Such proposal was prepared by Forsythe and delivered to Turner.

On May 26, 1977, Turner and Forsythe had a meeting. Forsythe testified that Turner agreed that his firm, Turner, Mason & Solomon, "would raise the $750,000.00 for a $10,000.00 fee," plus expenses. Turner testified that it was agreed that his firm would furnish consulting services in connection with his efforts to raise the desired capital and that such services were in the area of organization and fund raising. He further testified that it was understood that he, personally, was not required to fund PV International out of his own resources. On June 20, 1977, Turner told Forsythe that First Oklahoma Venture Company (First Venture) had expressed an interest in investing in PV International and that he was setting up a meeting with John Tinkle, the president of First Venture. On June 24, 1977, Turner told Forsythe that Tinkle wanted him (Forsythe) to go to Ecuador and try to close "the contract" with the government because more than the one operation in Malaysia was needed. Forsythe then went to Ecuador where he remained until July 19, 1977. In the meantime, Turner and Barbara Forsythe commenced "an affair," which continued until May 4, 1978, as hereinafter particularly detailed.

Forsythe also testified that on July 26, 1977, Turner "indicated" that he (Forsythe) "needed to go to Malaysia;" that PV International had problems in Malaysia with the production facility; and that he (Turner) thought it was more important to solve those problems than it was to complete the financing. The next day, July 27, 1977, Forsythe told Turner that PV International was out of working capital and that a Mr. Burridge "had committed that he could raise the $750,000.00." According to Forsythe, Turner told him "at that point that if they did not have an exclusive that he

would drop the whole thing, but that First Oklahoma Venture was on the verge of signing and that I just had to be patient, that the lawyers were slow in drawing up the papers." Forsythe accepted the explanation because, in his words, "I was dealing with a friend."

In September 1977, Forsythe flew to Quito, Ecuador, where "we executed the contracts." PV International was supposed to start building a plant immediately. Also, by the middle of September 1977, PV International was entirely out of money, and Forsythe borrowed money personally and sold personal assets to keep the company "going." At that time PV International was negotiating with Trojan Tylar Corporation about a license to produce elements of the explosives, and Turner told him that Tinkle wanted such negotiations concluded "before the money was put up." Forsythe, upon Turner's urging, flew to Salt Lake City, Utah, to talk with the people of Trojan Tylar.

In November 1977, Tinkle, Forsythe and Barbara Forsythe went to Malaysia to view the plant operations. Then, they went to Seoul, Korea, where Forsythe explained PV International's technology to people introduced to him by associates of Tinkle and Turner. All of this traveling was at the expense of PV International. On the plane flying back from Korea, Tinkle "indicated" to Forsythe that he was "excited" over the plant operations in Malaysia and the prospects of additional business in the Far East. Both Turner and Tinkle agreed, according to Forsythe, that after this trip they would complete the financing.

In the fall of 1977, Allstate Insurance Company expressed an interest in investing in PV International. Tinkle contacted Richard Dumlar, Allstate's representative, who was head of Allstate's Venture Capital Investment Department. Several meetings were held in Chicago and Dallas with Turner, Tinkle, Forsythe and Dumlar being present. However, Allstate did not invest in PV International.

As already noted, PV International had signed a contract with the government of Ecuador in September 1977. When the funds promised by Tinkle were not paid, the government of Ecuador agreed to extend the time of performance until January 1, 1978. At that time, PV International hired three engineers who were sent to Ecuador, and Turner "indicated" to Forsythe that "the money would be forthcoming very quickly."

On January 23, 1978, according to Forsythe's testimony, it was agreed between PV International and First Venture that:

(1) a limited partnership and a Texas corporation would be formed immediately, and simultaneously with the formation of such entities, First Venture would invest $350,000.00 in preferred stock in the corporation, which would result in its owning 35% of the stock;

(2) First Venture would loan the newly created corporation $350,000.00 and would place $50,000.00 in the limited partnership, which would give it 40% interest therein; and,

(3) PV International would be a limited partner and would own 50% of the limited partnership business and assets.

The signing of all documents necessary to finalize the agreement was scheduled for February 27, 1978. Forsythe had drafts prepared for all documents required of PV International incidental to the proposed funding in accordance with the accord reached on January 23, 1978. Tinkle did not have drafts of the documents required of First Venture. Consequently, the "deal" was not closed, and the $750,000.00 was not made available to PV International. Construction of the plant facilities in Ecuador was never begun, and the government of Ecuador cancelled the contract sometime prior to July 1978.

At Turner's request, Forsythe executed a letter dated March 27, 1978, stating that he had no claims against Turner or Turner, Mason & Solomon and that their services had been completed in full. Forsythe also went to Malaysia on March 27, 1978, where he remained until May 6, 1978. Upon his return, his wife told him of her affair with Turner. There were no further contacts between Turner, Tinkle, and Forsythe re-

lating to the raising of capital for PV International.

In summary, Turner contacted First Venture concerning the raising of $750,000.00 for PV International. From May 1977 until early May 1978, there were numerous meetings ·and extensive negotiations between First Venture and PV International concerning various equity and debt funding propositions. An Allstate Insurance Company affiliate was invited by Tinkle to join First Venture in making a substantial investment in PV International. Richard Dumlar, representing Allstate's subsidiary, was fully advised of all matters relating to the potential of PV International and the problems of funding. Allstate's affiliate did not make any investment in PV International. Various investigations and meetings were held; trips were made; and legal work was prepared by attorneys for First Venture and PV International. However, First Venture elected not to fund PV International. This decision was made after March 27, 1978, and prior to May 8, 1978. Turner did not fund any money for PV International. Suit for breach of the alleged oral agreement to provide funds was subsequently filed by PV International against Turner.

Concerning the judgment of $1,250,-000.00 in favor of PV International, the jury found:

(1) That Turner agreed to fund PV International's financial needs to the extent of $750,000.00, if not funded by other services (Special Issue No. 1);

(2) That such agreement was breached by failure to provide such funds (Special Issue No. 3);

(3) That Turner, individually, violated his fiduciary duty owed to PV International (Special Issue No. 6);

(4) That such breach was the producing cause of the loss in question (Special Issue No. 7);

(5) That Turner, individually, made one or more fraudulent misrepresentations [sic] to PV International with reference to providing financing to it during the time in question (Special Issue No. 8);

(6) That such fraud was the producing cause of the loss sustained by PV International (Special Issue No. 9);

(7) That the release letter of March 27, 1978 was procured by fraud (Special Issue No. 10);

(8) That the release letter of March 27, 1978 was procured in breach of a fiduciary duty (Special Issue No. 11); and,

(9) That the loss sustained by PV International was $1,400,000.00 (Special Issue No. 12).

Turner does not challenge by separate and distinct points of error any of the jury's findings listed above, except for the jury's answer to special issue twelve.

Turner, in his first point of error, contends that the trial court erred in rendering judgment for PV International because the agreement contravenes the statute of frauds and is, therefore, unenforceable. We disagree.

The initial agreement between Turner and Forsythe, in his capacity as president of PV International, was verbal. Turner argues that "the proposed funding for PV International was to be, in actuality, a corporate reorganization that included and required the sale of stock," and that "any such investment contact is a security under the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*" He further argues that the agreement contravenes the provisions of section 8.319 of the Texas Business and Commerce Code, which provides that a contract for the sale of securities must be in writing and signed by the party against whom enforcement is sought. He relies on *Kenney v. Porter*, 604 S.W.2d 297 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.), and *Consolidated Petroleum Industries v. Jacobs*, 648 S.W.2d 363 (Tex.App.—Eastland 1983, writ ref'd n.r.e.). Neither case is in point since an agreement for the sale of stock in a corporation was involved in both cases. That is not the case here.

The agreement upon which PV International sued Turner, whether it was to fund the $750,000.00 as argued by PV International or to furnish consulting services relating to the raising of capital as argued by Turner, was not restricted to a specific

funding source. There was no requested issue or finding that the $750,000.00 was to be funded from the sale of securities.

PV International alleged that Turner made misrepresentations to it and that he violated a fiduciary duty owed to PV International. The jury found that Turner made "fraudulent misrepresentations to PV International with reference to providing financing to it during the time in question" and that he, "acting individually, violated his fiduciary duty owed to PV International." The statute of frauds is not a defense to any action for damages based on fraud or breach of fiduciary duty, both being tort actions. *See Sibley v. Southland Life Insurance Co.,* 36 S.W.2d 145 (Tex.1931). In the instant case, PV International, in its action for damages, has alleged an action that is grounded in tort as well as in contract (breach of the agreement). The statute of frauds has no application in this case. Turner's first point of error is overruled.

In his third point of error, Turner asserts that the trial court erred in rendering judgment for PV International by virtue of the breach of the agreement because the doctrines of "judicial estoppel" and "collateral estoppel" preclude PV International from "pursuing this cause of action" against him. We do not agree.

Turner says that PV International is judicially estopped from complaining about his actions in connection with the services which he supplied PV International because, in a previous lawsuit filed by First Venture against PV International, the latter took the position that Turner was Venture's agent. Turner states PV International made these allegations in its pleadings "in connection with the exact same financing dispute that gave rise to the business claims portion of this lawsuit." Therefore, Turner argues that, since PV International maintained an inconsistent position in the instant lawsuit from its position in the prior lawsuit, it is judicially estopped from claiming that Turner was its agent and owed it a fiduciary duty. Turner further argues that the prior lawsuit, where PV International claimed that First Venture breached the agreement to raise $750,000.00 in capital funding for PV International, collaterally estops it from taking the position in this lawsuit that Turner committed the same breach. Thus, Turner claims that the doctrine of collateral estoppel precludes relitigation of identical fact or legal issues that were actually litigated and central to the judgment in the suit between First Venture and PV International, even though Turner was not a party to that lawsuit. In support of that position, Turner says that he, as the admitted agent of First Venture by PV International, was in privity with First Venture's interests and possessed the right to assert the collateral estoppel effect of the lawsuit between First Venture and PV International.

The pleading upon which Turner bases his claim is not before us in this appeal. Such pleading, "PV International's First Amended Cross–Action," filed by PV International in Cause No. 80–1138–G–134, in the 134th District Court of Dallas County, styled *First Venture Corporation of Bartlesville, Oklahoma v. PV International Corporation and Richard W. Forsythe,* was attached to Turner's First Amended Original Answer as an exhibit; however, it was not attached to his Fourth Amended Original Answer, his trial pleading, nor was it introduced in evidence. In that state of the record, we do not consider the allegations made by PV International in its cross-action against First Venture for any purpose.

Assuming, *arguendo,* that PV International's cross-action in this First Venture lawsuit is properly before us, there are reasons why judicial estoppel is not present in this case. Judicial estoppel requires pleadings or statements made under oath. *Thate v. Texas & P. Ry. Co.,* 595 S.W.2d 591 (Tex.App.—Dallas 1980, writ dism'd w.o.j.); *Aetna Life Ins. Co. v. Wells,* 557 S.W.2d 144, 147 (Tex.Civ.App.—San Antonio 1977), *writ ref'd n.r.e. per curiam,* 566 S.W.2d 900 (Tex.1978). The allegations made in the cross-action were not made under oath. Further, judicial estoppel bars a party from *successfully* maintaining a position in one action and then

maintaining an inconsistent position in a subsequent action. *See Long v. Knox,* 155 Tex. 581, 291 S.W.2d 292, 295–96 (1956). Here, PV International did not *successfully* maintain its cross-action in the prior suit.

■ Collateral estoppel requires a prior suit between the same parties or their privies and a previous litigation of fact or legal issues that were essential to judgment in the first lawsuit. *Van Dyke v. Boswell, O'Toole, Davis and Pickering,* 697 S.W.2d 381, 384 (Tex.1985); *Benson v. Wanda Petroleum Co.,* 468 S.W.2d 361 (Tex.1971). Turner was not a party to the litigation between First Venture and PV International. Turner claims that he was in privity with First Venture in the prior suit as First Venture's agent. Turner's agency claim is apparently based on PV International's allegations in its cross-action that Turner was First Venture's agent. PV International did not succeed in that action, however. Consequently, Turner's agency claim has no basis. Further, the issues litigated in this suit are different from those litigated in the prior suit. Neither "judicial estoppel" nor "collateral estoppel" exists in the present case. Turner's third point of error is overruled.

Turner claims in his second point of error that the trial court erred in rendering judgment for PV International by virtue of the breach of the agreement because Forsythe, in his capacity of president of PV International, executed a binding release that released any right that PV International possessed to pursue this cause of action against him. We do not agree.

The release in question, which was introduced into evidence, is in the form of a letter, dated March 27, 1978, and reads as follows:

Mr. Richard W. Forsythe
PV International Corp.
13601 Preston Rd.
Dallas, Texas 75240
Dear Dick:
We are in receipt of your payment to Turner, Mason & Solomon in the amount of $10,245.49. This letter is to state that this sum represents payment in full for all professional services rendered and expenses incurred to date by us. Moreover we state that our verbal agreement to provide financial, management and organizational consulting services to PV is completed to our full mutual satisfaction. We state that there are no unpaid, outstanding claims for services or expenses by Turner, Mason & Solomon against PV International or you personally. Nor do we have any rights to expectations of future consulting assignments or payments of any kind as a result of the performance of our past services. Additionally, by your execution of this letter agreement where indicated below, you stated that neither you personally, PV International Corporation, its affiliates or subsidiaries have any claim whatsoever against Turner, Mason & Solomon, Harry F. Mason or me personally and that our services have been completed in full as evidenced by your payment.

Sincerely,
/S/ M.M. Turner
M.M. Turner

MMT:cw

UNDERSTOOD AND AGREED TO BY:

/S/ Richard W. Forsythe
Richard W. Forsythe
President of PV International
3/27/78
Date

The jury, in response to special issues one and three, found that Turner "agreed to fund PV International's financial needs to the extent of $750,000.00 if not funded from other sources" and that such agreement "was breached by failure to provide such funds." The release relates solely to the initial agreement made in May 1977 by Turner and Forsythe in his capacity as president of PV International; it does not cover any other promise by Turner to provide funds. In that respect, and at the time the release was signed, Forsythe testified:

[Turner] wanted to be paid that fee prior to the closing of the $750,000.00, and he promised me when I returned from Malaysia that this time he would corner

Tinkle and have the money available when I got off the plane from Malaysia or else he would come in with the money from alternate routes....

 A release, valid on its face, until set aside, is a complete bar to any action by the releasor based on matters covered and discharged by the release. *Hart v. Traders & General Ins. Co.*, 144 Tex. 146, 189 S.W.2d 493 (1945); *Atkins v. Womble*, 300 S.W.2d 688 (Tex.Civ.App.—Dallas 1957, writ ref'd n.r.e.). P.V. International contends, however, that the release does not represent a bar to recovery because the jury found that it was procured by fraud. We disagree.

In *Community Development Construction Corp. v. Fleetwood*, 640 S.W.2d 331, 335 (Tex.App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.), the court said:

We find that the release in question was valid on its face, that it was properly identified and introduced into evidence and as such was a bar to Fleetwood's suit since the release had never been set aside and there were no pleadings requesting that it be set aside.

That is exactly the situation in this case. While PV International did allege that the release, because of fraudulent representations by Turner, was null and void, it did not sue to set it aside because of such alleged fraudulent representation. Moreover, the judgment did not set the release aside. There is no basis for a holding that the trial court impliedly set it aside. Therefore, the release, as a matter of law, is a complete bar to PV International's suit against Turner for breach of the initial agreement made in May 1977. However, it is not a bar to PV International's action to recover damages for Turner's alleged breach of his promise to "come in with the money from alternate routes" if First Venture failed to fund the $750,000.00.

Turner does not attack the jury findings in response to the questions asked it in special issue one and three. Turner's second point of error is overruled.

Turner, in his fourth point of error, contends that the trial court erred in awarding PV International damages in the amount of $1,250,000.00 because there was no causal link between such damages and any of the theories of recovery advanced by PV International. He further contends in his fifth point of error that there was no evidence or, alternatively, factually insufficient evidence, to support the jury's answer to special issue twelve, the damage issue.

Special issue twelve, and the jury's answer thereto, read as follows:

What sum of money, if paid now in cash, do you find from a preponderance of the evidence would reasonably compensate P.V. International for its losses and damages sustained, if any? In connection with this damage issue you will consider the following items of loss or damage, and none other: loss or depreciation in value of the assets of P.V. International and actual pecuniary loss sustained by PV International resulting from its inability to supply product for sale to Malaysia and Ecuador, if any, and to staff said countries with personnel. Answer in dollars and cents, if any, or 'None'.

Answer: 1.4 million dollars as to M.M. Turner

none as to Turner, Mason & Solomon

The charge contained no other definitions or instructions concerning this issue. Counsel for Turner objected to the submission of this issue on the grounds: (1) it did not restrict or limit the claim with reference to losses and damages attributable to any part of any cause of action alleged by PV International; (2) there was no element qualifying the inquiry about the loss and damages attributable to any wrongdoing on the part of Turner and the firm of Turner, Mason & Solomon; (3) it called upon the jury to speculate as to the depreciation in value of assets without identifying any cause for such depreciation; (4) it called upon the jury to speculate as to actual pecuniary loss from inability to supply product and staff without identifying any such claimed loss attributable to or identifiable with any wrongful conduct on the part of either Turner or the firm of Turner, Mason & Solomon; and (5) the

issue was not restricted to the matters raised in this lawsuit.

In general, PV International argues that the jury's damage finding as to Turner was based on the jury's finding of his fraud, breach of fiduciary duty, breach of contract, and proximate cause as to such actions, and that its damages recovery as to Turner was thus sufficiently established from Turner's found actions and causation. Additionally PV International argues that Texas Rules of Civil Procedure 279 requires all findings necessary to the judgment to have been found by the trial court.

PV International also argues that the amount of damages found by the jury in special issue twelve is virtually the same amount of damages shown by the evidence to be caused by Turner. Specifically, the evidence of future lost profits was $1,242,000.00 and the evidence of additional out-of-pocket expenses was $162,000.00, for a total of $1,404,000.00. PV International further argues that the jury's finding demonstrates that the damages found in special issue twelve were attributable to the actions and conduct of Turner and that the jury found Turner's fraud and breach of fiduciary duty was a producing cause of the loss.

In addition to the facts already set out in this opinion, there are other facts which are peculiar to the jury's answer to special issue twelve. By July 1978, the governments of Ecuador and Malaysia had cancelled the contracts with PV International for the manufacture of explosives in those countries. From May 1977 until July 1978, there had been a very substantial increase in the cost of certain component chemicals required for the manufacture of explosives by PV International. The evidence also established that there was market uncertainty in those countries. Forsythe testified that PV International expended $162,000.00 with respect to the expected and promised financial aid from First Venture and that such monies were spent at the insistance of Turner and Tinkle. He further testified that had the $750,000.00 been available in January 1978 or earlier, the ventures in Ecuador and Malaysia would

have resulted in a profit of $1,242,000.00. PV International continued to *sell* explosives to the government of Malaysia until 1983, when the government "switched to a Norwegian company producing explosives," and "that was the end of PV International."

In order to sustain a damage award, a plaintiff must secure a jury finding that the damages, including "lost profits," were causally linked to the wrongful act of the defendant, whether the standard of causation be proximate cause or producing cause. *El Paso Drive-In Cafes, Inc. v. Wilson*, 467 S.W.2d 200, 205 (Tex.Civ.App. —El Paso 1971, no writ); *LeBlanc, Inc. v. Gulf Bitulithic Co.*, 412 S.W.2d 86, 94 (Tex.Civ.App.—Tyler 1967, writ ref'd n.r. e.); *Pampa v. Long*, 110 S.W.2d 1001, 1003 (Tex.Civ.App.—Amarillo 1937, no writ). It is well established that the damage issue submitted to the jury must restrict the damages to those caused by the wrongful or negligent acts of the defendant, and a damage issue that does not so restrict such damages is fatally defective. *El Paso Development Co. v. Ravel*, 339 S.W.2d 360 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r. e.); *Melear v. Fairchild*, 278 S.W.2d 280 (Tex.Civ.App.—Amarillo 1954, no writ); *Standard Paving Co. v. Pyle*, 131 S.W.2d 200 (Tex.Civ.App.—Fort Worth 1939, no writ).

PV International argues that the jury's damage finding was "virtually identical" to the damage evidence. The problem with this argument is that there is still no linkage to causative conduct on the part of Turner. The losses proved and found could very well be related to other causes such as increased costs to obtain the components used to make the explosive, or the market uncertainty in Ecuador and Malaysia, or both. The damage issue was defective for failing to limit the jury to consideration of *only* that inability to supply product and staff which was caused by Turner's alleged breach, and not from other possible causes, such as higher component costs and market conditions.

As to the tort theories advanced by PV International in support of its claim that

judgment for $1,250,000.00 was properly authorized, and assuming, *arguendo*, that they are viable theories, in neither the "producing cause" issue, nor the damage issue, nor anywhere else in the trial court's charge, was the jury limited to consideration of damages causally linked to the tortious conduct of Turner. Vague references to the "loss" in special issue twelve are inadequate to render judgment for $1,250,000.00. Turner's objections to the submission of the issue should have been sustained. Turner's fourth point of error is sustained.

We now consider Turner's fifth point of error, wherein he claims that there is "no evidence," or alternatively, "factually insufficient evidence" to support the damage award to PV International of $1,250,000.00. PV International contends that the award was proper because it was entitled to a recovery of "lost profits" which were caused by Turner's breach of the agreement or tortious conduct.

■ As a general proposition, in order to recover for lost profits as consequential damages, the plaintiff must show the amount of the loss by competent evidence with "reasonable certainty." *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938). Recovery for profits that are anticipated or expected in the future, but which are lost due to an act or omission of the defendant, cannot be recovered where they are dependent upon "uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated." *Id.* at 1098 (quoting 17 C.J. *Damages* § 112–f (1919)).

■ If the business for which lost profits are sought is shown to be an ongoing business, then evidence that the business was established and making a profit at the time when the contract was breached or the tort was committed is admissible to show lost profits. *See White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983). Proof of an operation of a business at a loss, without more, fails to meet the test of showing lost profits with

reasonable certainty. *See First Texas Sav. Ass'n v. Dicker Center,* 631 S.W.2d 179, 187 (Tex.App.—Tyler 1982, no writ).

■ As a general rule, damages must be measured by a proper legal standard, and that standard must be used to guide the fact finder in determining what sum would compensate an injured party. *Jackson v. Fontaine's Clinics, Inc.,* 499 S.W.2d 87, 90 (Tex.1973); *Mangham v. Hall,* 564 S.W.2d 465, 468 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). In any given case, the measure of damages is a question of law. *International Great Northern Ry. Co. v. Casey,* 46 S.W.2d 669, 671 (Tex.Comm'n.App.1932, holding approved). In a breach of contract action, the measure of damages is just compensation for the loss or damage actually sustained. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952). The measure of damages for loss of profits as consequential damages, as is the case here, is net profits. *See R.A. Corbett Transp., Inc. v. Oden,* 678 S.W.2d 172, 176 (Tex.App.—Tyler 1984, no writ). "Net profits" is defined as "what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business." *Id.* at 176; *accord, Mangham,* 564 S.W.2d at 469; *Giles v. Rayburn,* 173 S.W.2d 371, 373 (Tex.Civ.App.—San Antonio 1943, no writ). Thus, in order to recover lost profits, damages must be shown with "reasonable certainty;" net profits must be shown by *objective,* rather than *subjective,* facts, figures, and data. *Automark of Texas v. Discount Trophies,* 681 S.W.2d 828, 830 (Tex.App.—Dallas 1984, no writ).

■ In proving a claim of "lost profits," if the business was not created by the contract in question then its profitability should be measured by the years preceding the breach. *See Verette v. Travelers Indemnity Co.,* 645 S.W.2d 562, 569–70 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.); *Birge v. Toppers Menswear, Inc.,* 473 S.W.2d 79, 85 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.). In *Davis v. Small Business Inv. Co.,* 535 S.W.2d 740 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.), a defendant company filed a counterclaim for dam-

ages on the ground that the appellant investment company had breached an agreement to secure additional financing for defendant. Undisputed evidence established that when the agreement for financing was negotiated, defendant had never operated at a profit. *Id.* at 743. As such, the court held that any award of lost profits would "necessarily be based upon pure speculation" and denied recovery as a matter of law. *Id.* at 743; *cf., Copenhaver v. Berryman,* 602 S.W.2d 540 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.) (plaintiffs produced no evidence that defendant's breach limited plaintiffs' expansion of their business to support award of additional lost profits).

■ It was conclusively established that PV International was incorporated in 1974. There was no evidence relating to "profit" or "loss" for the years 1974 and 1975. It was, however, conclusively proved that PV International did *not* operate at a profit during the years 1976, 1977, and 1978, although it did operate at a profit for the years 1979, 1980, 1981, and 1982.

PV International contends that "lost future profits are recoverable when a business has actual profits, or when a business establishes a basis for the computation of probable losses." It relies on *Pace Corporation v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 348–49 (1955); *Berne v. Keith,* 361 S.W.2d 592, 599 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.); and *Barbier v. Barry,* 345 S.W.2d 557, 563 (Tex.Civ.App.—Dallas 1961, no writ). It argues that *Pace* "expressly holds that actual profits made after the time of the wrongful conduct is sufficient to constitute the basis for damages."

The cases of *Pace, Barbier* and *Berne* do not support PV International's recovery of profits under the facts of the instant case. In *Berne,* for instance, the project had generated profits from its beginning in 1954 until the date of trial in 1961. *Berne,* 361 S.W.2d at 599. That is not so in the instant case.

In *Pace,* the challenge to the jury's award for "lost profits" was that "damages cannot be recovered for lost profits in

a new and unestablished business" and that the jury findings were based upon "pure speculation and conjecture." *Pace,* 284 S.W.2d at 348. The Supreme Court disagreed and concluded that since the business was established on the strength of the contract and *there being no other evidence of the profitability or unprofitability of the business,* evidence of sales and circumstances subsequent to the breach would support the jury's award of lost profits. *Id.* at 348–50. In the case at bar, the corporation had been in business since 1974 and, at the time of the alleged breach, had not made a profit in any of the four years that it had been in operation.

In *Barbier,* while the court recognized the rule that a recovery of lost profits will not be denied merely because a business is new if factual data is available to furnish a basis for computation of probable losses, it held that under the evidence the alleged loss of anticipated profits was too speculative to support a recovery. *Barbier,* 345 S.W.2d at 563. In the case here, considering the rising costs of components necessary for the manufacture of the explosives and the unstable market conditions in Ecuador and Malaysia, the anticipated profits are too speculative to warrant a recovery of lost profits.

PV International has failed, as a matter of law, to meet its burden of proving by evidence of probative value factual data necessary to support its claim for lost profits and upon which its alleged loss may be legally ascertained. All of the evidence offered by PV International in support of its claim that it is entitled to a recovery of anticipated profits renders such claim uncertain and speculative. The subjective opinion of Forsythe, an interested party, is not sufficient. There is no evidence which will support the recovery by PV International of $1,250,000.00 as consequential damages for lost profits. Turner's fifth point of error is sustained.

## FORSYTHE'S SUIT AGAINST TURNER

The jury further found: (1) that Turner, by his acts, intentionally alienated the affections that Barbara Forsythe, hereafter

"Barbara," had for Forsythe, her husband (special issue thirteen);[3] (2) that such acts were the producing, contributing or controlling cause of the alienation (special issue fourteen); (3) that Forsythe, by his acts, did not intentionally alienate the affections that Barbara had for him (special issue eighteen); and (4) that Forsythe did not know of the intimate relationship between Turner and Barbara before May 6, 1978 (special issue twenty-one). In addition, the jury awarded Forsythe $250,-000.00 as actual damages by reason of the alienation of affections of Barbara and $750,000.00 as exemplary damages (special issues fifteen and sixteen).

Turner, in his sixth point of error, contends that the trial court erred in rendering judgment against him in favor of Forsythe in the amount of $1,000,000.00 because the suit for alienation of affections is barred by the two-year statute of limitations. He claims that the testimony of Barbara and her husband established, as a matter of law, that if "there were an alienation of affections between Forsythe and his wife Barbara, it occurred in 1977."

A cause of action for alienation of affections at the time this suit was filed was governed by article 5526 of the Texas Revised Civil Statutes, the two-year statute of limitations.[4] *Whitley v. Whitley*, 436 S.W.2d 607, 609 (Tex.Civ.App.—Houston [14th Dist.] 1968, no writ).

 A cause of action for alienation of affections is an intentional tort arising out of the impairment of consortium between the spouses of a marriage. Consortium generally includes "the mutual right of the husband and wife to that affection, solace, comfort, companionship, society, assistance and sexual relations necessary to a successful marriage." *Whittlesey v. Miller*, 572 S.W.2d 665, 666 (Tex.1978). In order to establish a cause of action for loss of consortium, it is not necessary that there be a loss of all elements of consortium, but any substantial impairment of them caused by intentional conduct is sufficient. *Whitley*, 436 S.W.2d at 610; *Williams v. Rearick*, 218 S.W.2d 225, 229 (Tex.Civ.App.—Amarillo 1949, no writ); *Collier v. Perry*, 149 S.W.2d 292, 294 (Tex.Civ.App.—El Paso 1941, writ dism'd judgmt cor.).

For purpose of application of the two-year statute of limitations, a cause of action generally accrues at a time when facts come into existence which authorize the plaintiff to file suit. However, an exception to this accrual rule has been applied in some situations where the plaintiff was unable to know of his injury at the time of actual accrual; the exception is known as the "discovery rule." *Robinson v. Weaver*, 550 S.W.2d 18, 19 (Tex.1977). The discovery rule has been applied in actions based on fraud. Where the fraud is concealed or unknown to the defrauded party, limitation does not begin to run when the fraud is perpetrated. Instead, it begins to run from the time the fraud is discovered or could have been discovered through the exercise of reasonable diligence. *See, e.g., Mooney v. Harlin*, 622 S.W.2d 83, 85 (Tex. 1981); *Quinn v. Press*, 135 Tex. 60, 140 S.W.2d 438, 440 (1940). The discovery rule has also been applied in the following cases: *Kelley v. Rinkle*, 532 S.W.2d 947 (Tex.1976) (suit for defamation); *Gaddis v. Smith*, 417 S.W.2d 577 (Tex.1967) (where a foreign object was negligently left by a surgeon in his patient's body)[5]; *Rothman v. Gulf Coast Investment Corp.*, 497 S.W. 2d 792 (Tex.Civ.App.—Beaumont 1973) (breach of contract), *rev'd on other grounds*, 506 S.W.2d 856 (Tex.1974); and *Ellison v. McGlaun*, 482 S.W.2d 304, 311–12 (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r.e.) (action for fraudulent concealment of indebtedness).

In *Turner v. Turner*, 385 S.W.2d 230, 239 (Tex.1964), the Supreme Court held

---

**3.** The 70th Legislature, in Regular Session, abolished suits for alienation of affections, effective September 1, 1987. Act of June 17, 1987, ch. 453 §§ 1, 2, 1987 Tex.Gen.Laws 2030.

**4.** Now TEX.CIV.PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986).

**5.** In enacting TEX.REV.CIV.STAT.ANN. art. 4590*i* § 10.01 (Vernon Supp.1989), the legislature abolished the discovery rule in health care liability cases where application of that section does not violate the Texas Constitution. *Morrison v. Chan*, 699 S.W.2d 205, 208 (Tex.1985).

that the period of limitations began to run from the time of the plaintiff wife's loss of consortium and not from the time that her husband "felt a lessening of his affections" for her.

As hereinbefore noted, Forsythe filed this lawsuit on May 6, 1980. By June 1977, during social encounters between the Turners and the Forsythes, Barbara first began to feel that Turner had charisma and was very exciting. By July 1977, the affair had begun in earnest. Barbara and her husband were having problems at that time. On July 12, 1977, Barbara and Turner had sexual relations for the first time. By the first of August 1977, she said that she knew she loved him. They had had a "whirlwind affair" and spent a great deal of time together. They had sexual relations a couple of times a month, and they saw each other many more times than that. The affair ended on May 4, 1978. Barbara testified that during the time of this affair she loved her husband, but she was not "in love" with him, and that in 1977 she transferred her love for her husband to Turner. It is undisputed that Barbara told her husband on May 8, 1978, that she wanted a divorce and that she was considering marriage to Turner. Forsythe testified that he lost the affections of his wife in 1977 and that the signal of that was, among other things, that she seemed to be colder toward him and did not seem to enjoy making love to him as much as she had in the past.

 We have concluded that the "discovery rule" should apply in an alienation of affection suit. While there is testimony from Forsythe himself that he lost the affections of his wife in 1977, the evidence, when viewed in its entirety, shows that there was no material loss of consortium until May 8, 1978. The evidence shows that Forsythe did not learn of the relationship between Turner and Barbara until such date. There is no evidence that Forsythe should have learned of such relationship prior to May 8, 1978, by the exercise of reasonable diligence. We, therefore, hold that the period of limitations in this case began to run on May 8, 1978, and that Forsythe's suit for alienation of affec-

tions was not barred by the two-year statute of limitations. Turner's sixth point of error is overruled.

In his seventh point of error, Turner claims that the trial court erred in admitting into evidence tape recorded telephone conversations between him and Barbara because the records were the result of an illegal wiretap and should have been excluded under section 2515 of title 18 of the United States Code. We agree.

Forsythe testified that Barbara told him in July 1978 that she had had sexual relations with Turner. At that time, there was an agreement between Forsythe and Turner that Turner would not contact Barbara for a period of 120 days (which would expire in September 1978). Forsythe further testified that when he learned of the sexual relationship between Turner and Barbara, he purchased a wiretapping and tape recording device and hooked it up to his residential telephone. This device remained in operation until December 1978. During that period of time, all telephone conversations via his residential telephone were taped and recorded, including numerous conversations between Turner and Barbara. Neither Turner nor Barbara knew that the telephone had been tapped and that their conversations were being recorded. Barbara did not learn of this fact until two weeks before trial, about July 1, 1984. The tape recordings were typed by Forsythe's secretary. When the recordings and typewritten transcriptions thereof were offered into evidence, Turner objected to their introduction on the ground that they were in violation of the federal wiretap statute, 18 U.S.C. § 2510, *et seq.* The objection was overruled and the tape recording and the typewritten transcriptions were introduced into evidence.

The tape recordings and the typed transcriptions thereof brought to the jury the most intimate and private conversations between Barbara and Turner. The transcriptions comprised sixty-six single-spaced pages. There is no need to detail the conversations.

The issue presented by this point of error is the scope of the Omnibus Crime Control

and Safe Street Act of 1968, 18 U.S.C. §§ 2510 *et seq.*, sometimes called "The Federal Wiretap Statute." In pertinent part, section 2511(1)(a) of that statute makes it illegal for any person, except as otherwise provided in the Act, to willfully intercept any wire or oral communication.[6] The statute further makes it illegal for any person to disclose "to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection." 18 U.S.C. § 2511(1)(c). Section 2511(2)(d), however, allows a person to intercept wire or oral communications where "such person is a party to the communication or where one of the parties to the communication has given *prior* consent to such interception...." 18 U.S.C. § 2511(2)(d) (Emphasis added).

> Section 2515, in pertinent part, provides: Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial [including trials in state courts] ... if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515. The statutory definition of "person" includes "any individual." 18 U.S.C. § 2510(6). Forbidden communications include communications which are "unlawfully intercepted." 18 U.S.C. § 2518(10)(a)(i).

█ Section 2511 establishes a broad prohibition of all private electronic surveillance. *United States v. Jones*, 542 F.2d 661 (6th Cir.1976). Nevertheless, Forsythe argues in his brief that the "Federal Wiretap Statute does not apply to recording conversations of one's own residence." He relies upon *Simpson v. Simpson*, 490 F.2d 803 (5th Cir.), *cert. denied*, 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). In that case, the husband attached a wire tapping device to his residential telephone and intercepted his wife's conversation with a third party and used such conversation to obtain a divorce. Thereafter, his ex-wife sued him to recover civil penalties pursuant to 18 U.S.C. § 2520. The Court in the ex-wife's suit determined that the statute did not apply to recordings of telephone conversations made by the husband at his residence.

There do not appear to be any Texas cases on the issue raised by Turner in this his seventh point of error. However, several courts in other jurisdictions have refused to follow the holding in *Simpson*, while other courts have followed it.[7]

Forsythe further contends in his brief that "an exception to [the] Federal Wiretap Statute is the consent to such recording by one party to the conversation." 18 U.S.C. 2511(2)(d); *U.S. v. Hodge*, 539 F.2d 898 (6th Cir.1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977). We agree. However, in support of that contention, he argues: "Mrs. Forsythe consented to the tapes being played to the jury, and such consent acts as a consent to the recording." To this, we do not agree.

The Act applies to civil as well as criminal cases; to state as well as federal pro-

---

6. Sections 2511(1)(a), (1)(c) and (2)(d) were amended in 1986 to include electronic communication as well as oral and written communications. Electronic Communication Privacy Act of 1986, Pub.L. No. 99–508, 101(c)(1)(A), 100 Stat. 1848, 1951. In addition, "willfully" was changed to "intentionally" in sections 2511(1)(a) and (1)(c). *Id.* 101(f)(1), 100 Stat. 1948, 1983. The statute is discussed in this opinion as it existed at the time of the recordings and trial.

7. The courts in the following cases have repudiated the holding in *Simpson*: *Pritchard v. Pritchard*, 732 F.2d 372 (4th Cir.1984); *United States v. Jones*, 542 F.2d 661 (6th Cir.1976); *Flynn v. Flynn*, 560 F.Supp. 922 (N.D.Ohio 1983);

*Heyman v. Heyman*, 548 F.Supp. 1041 (N.D.Ill. 1982); *Gill v. Willer*, 482 F.Supp. 776 (W.D.N.Y. 1980); *Kratz v. Kratz*, 477 F.Supp. 463 (E.D.Pa. 1979); *Remington v. Remington*, 393 F.Supp. 898 (E.D.Pa.1975); *Richenbacker v. Richenbacker*, 290 N.C. 373, 226 S.E.2d 347 (1976); *Stamme v. Stamme*, 589 S.W.2d 50 (Mo.Ct.App.1979). The courts in the following cases have followed the holding in *Simpson*: *Anonymous v. Anonymous*, 558 F.2d 677 (2nd Cir.1977); *Kempf v. Kempf*, 677 F.Supp. 618 (E.D.Mo.1988); *Lizza v. Lizza*, 631 F.Supp. 529 (E.D.N.Y.1986); *Baumrind v. Ewing*, 276 S.C. 350, 279 S.E.2d 359, *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981).

ceedings. *United States v. Giordano*, 416 U.S. 505, 528 n. 17, 94 S.Ct. 1820, 1832–33 n. 17, 40 L.Ed.2d 341 (1974). Texas courts are bound by the provisions of the Act. *Matter of Bates*, 555 S.W.2d 420, 431 (Tex. 1977).

The purpose of the section 2515 is not only to ensure that courts do not become partners to illegal conduct, but also to protect privacy. *See Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed. 2d 179 (1972). Thus, the Act is designed to prohibit "all interceptions of oral and wire communications, except those specifically provided for in the Act...." *Giordano*, 416 U.S. at 514, 94 S.Ct. at 1826. *See also United States v. Burroughs*, 564 F.2d 1111, 1114 (4th Cir.1977). Texas recognizes the same right of privacy which lies at the heart of the federal statute. *Billings v. Atkinson*, 489 S.W.2d 858, 860 (Tex. 1973). The provisions of the Act have been applied to suits for alienation of affections in other jurisdictions. *Pulawski v. Blais*, 506 A.2d 76, 78 (R.I.1986); *see also Chappell v. Redding*, 67 N.C.App. 397, 313 S.E. 2d 239, 244 (Ct.App.1984).

First, we dispose of the contention by Forsythe that Barbara "consented to the tapes being played to the jury, and such consent acts as a consent to the recording." That contention is without merit for two reasons. First, the statute, 18 U.S.C. § 2511(2)(d), plainly states that there is no violation where one of the parties to the communication has given "*prior* consent to such interception." In this case, it was conclusively shown that Barbara did not know that her conversations with Turner were being recorded until two weeks before trial; therefore, she could not have given "prior consent to such interception [recording]." Second, there is no evidence that she consented to the introduction of the taped recordings or typewritten transcriptions thereof in evidence.

■ As to Forsythe's argument that the wiretap statute does not apply to interspousal recording, we believe that the decision in *Simpson* is wrong. We, therefore, decline to follow it. We are not bound to follow the holding in that case merely be-

cause Texas lies within the geographic limits of the Fifth Circuit but are bound to follow only the decision of the United States Supreme Court and the Texas Supreme Court on a particular question of law arising in a civil case. *Barstow v. State*, 742 S.W.2d 495, 500–01 (Tex.App.— Austin 1987, writ denied); *Summertree Venture III v. Federal Sav. & Loan Ass'n*, 742 S.W.2d 446 (Tex.App.—Houston [14th Dist.] 1987, writ denied); *Woodard v. Texas Dep't of Human Resources*, 573 S.W.2d 596, 598 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.). Neither the United States Supreme Court nor the Texas Supreme Court has addressed the issue.

*Simpson* creates an exception which is not found in the Act itself. If Congress had intended to create a special exception for interspousal wiretap of their residential telephone, it would have so provided when the Act was enacted. We hold that the Act (18 U.S.C. §§ 2510, *et seq.*) prohibits *all* wiretapping activities unless specifically excepted. There is no express exception for instances of willful electronic interceptions of conversation between a spouse and a third party without prior consent. We decline to create such an exception, even where the wiretap device is attached to the telephone in the spouses' residence, as is the case here. *Pritchard v. Pritchard*, 732 F.2d 372 (4th Cir.1984); *Kratz v. Kratz*, 477 F.Supp. 463 (E.D.1979); *Stamme v. Stamme*, 589 S.W.2d 50 (Mo.App.1979); *Markham v. Markham*, 265 So.2d 59 (Fla. App.1972).

Moreover, *Simpson* is distinguishable from the case at bar on the facts. In that case, the suit was between the ex-wife and her former husband. Here, the suit is between the husband and a third party.

In the instant case, it is not just the privacy of the wife that is involved, but that of a third party as well. The introduction of the recording and the typed transcriptions was inherently prejudicial to Turner. *See Pulawski v. Blais*, 506 A.2d 76, 78 (R.I.1986).

■ Having determined that section 2511(1)(a) applies to interspousal wiretaps, the provisions of section 2515 of the Act

prohibit the admission in evidence of the telephone recordings and the typed transcriptions thereof. It was reversible error to admit them into evidence. Turner's seventh point of error is sustained.

■ In his eighth point of error, Turner asserts that the trial court committed reversible error in admitting evidence of his extraneous extra-marital affairs because such evidence was irrelevant, or alternatively, any probative value was substantially outweighed by the danger of unfair prejudice, causing the jury to decide the cause on an improper basis. We agree.

Counsel for Forsythe, in his examination of Turner as an adverse party, in effect, brought to the attention of the jury that Turner was, in general, a rake and a philanderer and that Turner perfected schemes in the guise of marriage-counseling to commence sexual relations with other women. Specifically, he inquired about such "marriage-counseling" of four named women. One of the women testified that she had had a sexual affair with Turner. Another woman testified that Turner "made a pass at her." Barbara, in her testimony, repeatedly mentioned Turner's affairs with other women. She testified that she voluntarily took the stand to try to keep Turner from continuing to take advantage of other women.

The record shows that Turner admitted that he had an affair with Barbara which commenced in July 1977 and continued until May 4, 1978. This admission was made before evidence of any of his other affairs was offered into evidence. Counsel for Turner objected to the introduction into evidence of any of such affairs, on the grounds that they were irrelevant to any *contested* issue in the case, and that they had no probative value since Turner never denied having an affair with Barbara, but, on the other hand, readily admitted such fact. All of the objections were overruled.

Evidence of extraneous extra-marital affairs, if offered under Texas Rule of Civil Evidence 404(b), must relate to an issue "actually being controverted." Otherwise, the evidence has no probative value. 2 J. Weinstein & M. Berger, *Weinstein's Evidence* § 404[09] (1988). A scheme, plan or design to commence an affair through a counseling ruse only goes to prove that such ruse was employed in the case at bar to commence the affair in question. The ultimate object is to prove that an affair took place.

It is undisputed that Turner and Barbara had an affair. Turner also admitted that he and Barbara discussed her marriage troubles, and he admitted that he and Barbara discussed her getting a divorce from her husband. The evidence of the other extra-marital affairs does not relate to a contested issue in this case, and, therefore, has no probative value whatsoever. The only thing that such evidence could accomplish was to inflame the minds of the jury and cause them to decide the case on an improper basis.

Texas Rule of Civil Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

"Unfair prejudice" refers to "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." FED.R.EVID. 403 advisory committee note.

That the introduction into evidence of the other extra-marital affairs had its intended effect is apparent from the verdict. The jury awarded Forsythe $250,000.00 for pecuniary loss by reason of the alienation of affections. More indicative of the prejudice and passion aroused in the jury is the exemplary damage award of $750,000.00. This verdict is especially startling in light of the testimony of Barbara, who admitted that she still loved her husband, although "in a different way," after the affair with Turner. She and her husband were still married and were living together at the time of trial (July 1984). The only explanation for the damage awards in the light of all the evidence is that the jury decided the case on an improper basis, an emotional

basis; as a result of aroused passions and sympathies; and as the result of a jury perception of Turner being the habitual adulterer. This is precisely the result which Rule 403 is designed to prevent. Turner's eighth point of error is sustained.

In view of our sustaining Turner's seventh and eighth points of error, and since the judgment of the trial court will be reversed and the cause remanded, there is no need for us to consider his ninth and tenth points of error, wherein he challenges the jury's finding of $250,000.00 actual damages and $750,000.00 exemplary damages. However, were we to consider these points, we would hold that the admissible evidence is factually insufficient to support the jury holding of $250,000.00 as actual damages and that the jury finding of $750,000.00 as exemplary damages, under the admissible evidence, is clearly excessive and shocks the conscience of this Court.

The action brought by PV International Corporation against Malcolm Turner is severed from the action brought by R.W. Forsythe against Malcolm Turner. The judgment of the trial court, insofar as it awarded PV International Corporation a recovery of $1,250,000.00 as damages against Malcolm Turner, together with interest thereon from date of judgment, is reversed, and judgment is here rendered that PV International Corporation take nothing in its suit against Malcolm Turner. The judgment of the trial court, insofar as it awarded R.W. Forsythe a recovery of $1,000,000.00 as damages against Malcolm Turner, together with interest thereon from date of judgment, is reversed and the cause is remanded to the trial court for a new trial. Costs are assessed 50% to PV International and 50% to R.W. Forsythe.